732 F.2d 1302
 Fed. Sec. L. Rep. P 91,457, 10 Media L. Rep. 1593
 In the Matter of CONTINENTAL ILLINOIS SECURITIES LITIGATION.
Appeal of CONTINENTAL ILLINOIS CORP. & Continental Illinois
National Bank & Trust Co. of Chicago.
 No. 83-2973.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 8, 1983.
Decided April 23, 1984.
Rehearing and Rehearing En Banc Denied June 20, 1984.
 
 Franklin P. Auwarter, Mayer, Brown & Platt, Chicago, Ill., for appellant.
 Michael Conway, Jeremiah Marsh, William J. McKenna, Jr., Hopkins & Sutter, Chicago, Ill., Robert D. Sack, Ann Loeb, Patterson, Belknap, Webb & Tyler, New York City, for appellee.
 Before PELL, CUDAHY and POSNER, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 In this appeal we must balance the public's right of access to documents relied on as evidence in civil proceedings against a party's interest in the confidentiality--based primarily upon the attorney-client privilege--of its investigation into the merits of derivative suits brought on its behalf. The district court held that Dow Jones & Company, Inc. (publisher of The Wall Street Journal ) and Field Enterprises, Inc. (publisher of the Chicago Sun-Times ) (collectively the "Newspapers") are entitled to copies of the Special Litigation Committee Report (the "Report") compiled in connection with derivative actions pending in the district court. Because the Report was admitted into evidence in connection with a motion pending before the district court and because the court expressly relied on the Report in reaching a tentative disposition of the motion, the public is presumptively entitled to the Report. The district court did not abuse its discretion in concluding that this presumption was not rebutted in this case. Therefore, we affirm the order of the district court granting access to the Report.
 
 I. BACKGROUND
 A. The Securities Litigation
 
 2
 Appellants, Continental Illinois Corporation ("CI Corp.") and its wholly-owned subsidiary, the Continental Illinois National Bank and Trust Company of Chicago (the "Bank") (collectively "Continental"), are defendants in derivative suits and class actions in the district court.[1] The derivative suits were brought by shareholders to compel Continental to assert claims it may have against third parties or, alternatively, to allow the shareholders to assert such claims on Continental's behalf. CI Corp.'s board of directors formed a Special Litigation Committee ("SLC") to evaluate the various derivative claims. Under Delaware law, which applies because CI Corp. is a Delaware corporation, if the corporation on whose behalf a derivative suit is brought decides, with court approval, that pursuit of the claim is not in the corporation's best interest, the action may be dismissed.[2] See Zapata Corp. v. Maldonado, 430 A.2d 779 (Del.1981). The SLC was formed, presumably, so that none of the directors sued in the various actions would participate in the decision whether to terminate the claims. See Maldonado, 430 A.2d at 786.
 
 
 3
 CI Corp. empowered the SLC to conduct an investigation into the basis of the pending derivative actions to determine whether the actions should be dismissed as not being in the best interests of the Corporation. To assist it in this endeavor, the SLC retained the law firm of Jenner & Block and its partner, former U.S. Circuit Judge Philip W. Tone, as legal counsel. Jenner & Block, in turn, engaged Thomas A. Donahoe and the accounting firm of Price Waterhouse as its accounting consultants for investigation of allegations against Continental's independent auditors, Ernst & Whinney.
 
 
 4
 The SLC, with the aid of counsel, conducted its investigation between September 27 and December 7, 1982. This investigation involved, inter alia, reviewing numerous documents and summaries of interviews conducted earlier by the law firm of Mayer, Brown & Platt, which was Continental's counsel in the district court litigation. Additionally, Jenner & Block, on behalf of the SLC, conducted more than eighty interviews of bank employees and others who might have information about the Penn Square Bank fiasco. The law firm also researched the law applicable to the derivative claims, the standards governing special litigation committees and the availability of insurance coverage for liabilities arising in the litigation.
 
 
 5
 On December 7, 1982, the SLC met and decided that it would be in Continental's best interest to terminate all of the derivative actions except the Penn Square-related claims against three former officers of the Bank. Jenner & Block then prepared the Report which is the subject of this appeal, reporting and defending the SLC's conclusions. "The Report is 158 pages long and is a full and candid discussion of all of the SLC's significant factual findings, its understanding of the applicable law, and its conclusions." Brief of Appellants at 8.
 
 
 6
 On December 8, Continental moved in the district court to terminate the claims the SLC found to be not in Continental's best interests. This brought into play the standards prescribed in Zapata Corp. v. Maldonado, 430 A.2d 779 (Del.1981), which govern a court's review of a corporation's decision to terminate a derivative suit. The district court's interpretation of Maldonado led it to conclude that the reasonableness of the SLC's investigation and findings was an important determinant of whether it was proper to terminate the claims.[3] Thus, the Report became crucial to disposition of the motion to terminate. And on May 13 the district court--Judge John Grady--ordered Continental to provide the court and opposing counsel with a copy of the Report.[4]
 
 
 7
 The district court determined that in order to terminate the claims, Continental had the burden of showing that the SLC conducted an independent investigation in good faith and that the bases for its conclusions were reasonable. (Step One). See Order dated May 6, 1983 pp. 5-6. 572 F.Supp. 928. If Continental met that burden then the district court would exercise " 'its own independent business judgment' in determining whether the motion to dismiss should be granted." (Step Two). Id. at 5 (quoting Maldonado, 430 A.2d at 789). Continental introduced the Report into evidence at the June 30, 1983 hearing on Step One, presumably to support its claim that the SLC conducted an independent, good faith investigation and that the SLC's conclusions were reasonable. The record also indicates that witnesses testified in open court, on both direct and cross-examination, about the contents of the Report. In fact, on cross-examination in open court, plaintiffs' counsel read excerpts from the Report aloud to witnesses.
 
 
 8
 After the June 30 testimony was completed, Judge Grady, still in open court, discussed his "tentative impressions" of the merits of Continental's motion. It is apparent from the transcript that these "tentative impressions" were the result of detailed, careful analysis of the factual and legal issues raised by Continental's motion. Judge Grady agreed with the SLC that the cases against the outside directors should be dismissed. The trial judge noted that, if he were to find in favor of the plaintiffs on Step One, he would apply his own business judgment (Step Two) and conclude that public policy dictated dismissing the cases against the outside directors. Judge Grady disagreed, however, with the SLC's decisions concerning Ernst & Whinney and three bank officers, George R. Baker, Patrick M. Goy and James D. Harper, Jr. The court also stated that further argument was necessary on whether Continental's motion should be granted with respect to five additional defendants. In the cases of Ernst & Whinney and Harper, the district court concluded that the SLC's investigations were inadequate.[5] Regarding Baker and Goy, Judge Grady concluded that the suit should not be dismissed as to them despite the SLC's conclusion that recovery from the remaining defendants would provide the maximum financial benefits. Judge Grady feared that a jury might react to what would appear to be selective prosecution among bank officials by refusing to find anyone liable.
 
 
 9
 After hearing further argument on July 1, 1983, the district court set September 6, 1983, as the date for a further hearing on the motion to terminate. At the July 1 hearing, however, Judge Grady made it clear that only the plaintiffs were to be allowed to present evidence on September 6 and that the SLC had effectively rested its case and would only be allowed to present "argument from Counsel on the evidence ... already heard." Continental Appendix at 389. In fact, Judge Grady clearly conveyed his attitude that his "tentative impressions" would become his rulings unless argument by defense counsel or evidence on behalf of the plaintiffs changed his mind. Continental Appendix at 384-85. The tentative nature of Judge Grady's conclusions appears to derive from the fact that the plaintiffs had not yet put on their case. It, therefore, seems more likely that what might have changed Judge Grady's mind was the evidence to be proffered by the plaintiffs rather than legal argument by the defendants.
 
 
 10
 On August 5, 1983, consistent with the district court's announced conclusions, the plaintiffs agreed to dismiss the derivative claims against the outside directors. On August 22, 1983, again in conformity with Judge Grady's views, Continental withdrew the motion to terminate the claims against the remaining defendants. In a letter to the district court, Continental's counsel explained that Continental did not wish to participate in a "mini-trial" of the merits of the claims against the remaining defendants. Such a "mini-trial" would have been necessary because of the district court's conclusion that it was required, under Maldonado, to evaluate the reasonableness of the SLC's decision to terminate the claims and to exercise its own business judgment before deciding the motion.[6]
 
 B. The Newspapers' Motion for Disclosure
 
 11
 Reporters from the Chicago Sun-Times and The Wall Street Journal covered the proceedings in the district court. A Wall Street Journal reporter attended the June 30 and July 1 hearings and wrote an article discussing Judge Grady's decision which appeared in the Journal 's July 1, 1983 edition. An article written by a Chicago Sun-Times reporter appeared in that newspaper's July 5 edition. Both reporters informally requested access to the Report from the district court and, upon the district court's instructions, made formal motions to that effect.
 
 
 12
 On October 31, 1983, Judge Grady ordered that "the materials [he] considered" in arriving at his tentative impressions "should be open to inspection" by the press. Judge Grady specifically identified the Report as one of the documents he had considered and asked the parties to attempt to agree on which other documents should be produced. In arriving at this decision, Judge Grady apparently felt that his "tentative impressions" expressed after the June 30 hearing were tantamount to a judicial decision. He adopted this view because, consistent with the "impressions," the parties dismissed the outside directors and withdrew the motion to terminate in relation to the remaining defendants.[7]
 
 This appeal followed.[8]
 II. APPEALABILITY
 
 13
 The order requiring disclosure of the Report did not terminate the litigation in the district court. Thus, we must first address whether there has been a "final decision" of the district court within the meaning of 28 U.S.C. Sec. 1291, sufficient to confer appellate jurisdiction.
 
 
 14
 If the order appealed from did not terminate the proceedings in the district court, it must meet the four prerequisites of the "collateral order" doctrine of Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949). Three of the collateral order requirements present no problem in this case. The matter appealed from, disclosure of the Report, is, first, clearly separable from the merits of the underlying securities litigation and second, presents this court with important and unresolved legal questions. Third, if we were without jurisdiction to entertain this appeal, the rights asserted would be lost because, presumably, the Report would be released immediately. Once the Report was released, any error in releasing it would be impossible to correct. Compare In re UNR Industries, Inc., 725 F.2d 1111, 1117-18 (7th Cir.1984). Thus, these three requirements of the Cohen doctrine are easily met. See generally In re UNR Industries, Inc., 725 F.2d at 1116-18; United States v. Dorfman, 690 F.2d 1230, 1231-32 (7th Cir.1982); Oswald v. General Motors Corp., 594 F.2d 1106, 1118-21 (7th Cir.), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979).
 
 
 15
 There is a special problem in the application of the collateral order test to this case. The order appealed from is somewhat ambiguous as to whether Judge Grady actually ordered disclosure of the Report. For the district court held that all materials he relied on in formulating his decision on the motion to terminate were subject to disclosure. He further noted that he relied mainly on the Report. Finally, however, Judge Grady invited the parties to attempt to agree on which documents were subject to disclosure based on his order. The Supreme Court has indicated that, as an additional collateral order requirement, "tentative" decisions by the district court should not be appealable under the Cohen doctrine. See Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 & n. 11, 98 S.Ct. 2454, 2458 & n. 11, 57 L.Ed.2d 351 (1976). While it may have been better practice to defer this appeal until a complete list of the documents subject to the order had been compiled, Judge Grady unequivocally held that the Newspapers were entitled to the Report. While conceivably the district court could, while compiling the list, have modified or reversed this conclusion, the likelihood of this happening is too slight to affect the finality of Judge Grady's decision. See Oswald, 594 F.2d at 1118; 15 L. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE Sec. 3911 at 470 (1976). Therefore, we conclude that we have jurisdiction of this appeal under 28 U.S.C. Sec. 1291. Cf. In re San Juan Star, 662 F.2d 108, 112-13 (1st Cir.1981) (order prohibiting disclosure of deposition evidence appealable under "collateral order" doctrine).
 
 III. THE MERITS
 
 16
 In support of its contention that the Report should remain confidential, Continental has presented us with an array of purported impediments to disclosure. Continental argues (1) that the presumption of access to evidentiary material does not apply in this case; (2) that, instead, our only inquiry should be whether "good cause" existed for the entry of a protective order under FED.R.CIV.P. RULE 26(c) when the Report was originally sealed; (3) that the district court did not consider, or failed to attach adequate weight to, Continental's interest in confidentiality; and (4) that the failure of the district court to make findings on the weight to be accorded the various interests in disclosure or confidentiality of the Report requires us either to make a de novo examination of the case or to remand the case for such findings. While all of Continental's contentions are addressed below, we think it appropriate to view the case as presenting the question whether the district court properly balanced the public's right of access to court documents and Continental's interests in confidentiality. Detailed findings might have simplified our task, but in the end we are unpersuaded that the district court acted improperly in ordering disclosure of the Report.
 
 
 17
 A. The Presumption of Access to Court Records
 
 
 18
 Continental does not argue, and at this late date could not argue, that the long-recognized presumption in favor of public access to judicial records does not exist. The public's right of access to judicial records has been characterized as "fundamental to a democratic state[.]" United States v. Mitchell, 551 F.2d 1252, 1258 (D.C.Cir.1976), rev'd on other grounds sub nom. Nixon v. Warner Communications, Inc., 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), quoted in United States v. Edwards, 672 F.2d 1289, 1294 (7th Cir.1982). Recently, we recognized that this presumption is of constitutional magnitude. See United States v. Dorfman, 690 F.2d at 1233-34. Accord, Associated Press v. District Court, 705 F.2d 1143, 1145 (9th Cir.1983) (first amendment right of access to pretrial documents); In re San Juan Star, supra, (same).
 
 
 19
 Most of the cases recognizing the presumption of access relate to the right of the public (and press) to attend criminal proceedings and to obtain documents used in criminal cases. See, e.g., Press-Enterprise Co. v. Superior Court, --- U.S. ----, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984); Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); United States v. Dorfman, supra; United States v. Edwards, supra. However, we agree with the Sixth Circuit that the policy reasons for granting public access to criminal proceedings apply to civil cases as well. See Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d 1165, 1179 (6th Cir.1983). See also Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580, 100 S.Ct. 2814, 2829, 65 L.Ed.2d 973 (1982) (opinion of Burger, C.J.); id. at 596, 100 S.Ct. at 2838 (opinion of Brennan, J.); id. at 599, 100 S.Ct. at 2839 (opinion of Stewart, J.). These policies relate to the public's right to monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system.[9] See Press-Enterprise Co. v. Superior Court, 104 S.Ct. at 823-24; Globe Newspaper Co. v. Superior Court, 457 U.S. at 606, 102 S.Ct. at 2620; See also Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d at 1179; Crystal Grower's Corp. v. Dobbins, 616 F.2d 458, 461 (10th Cir.1980).
 
 
 20
 Continental has utterly failed to convince us that the presumption of access does not apply to the proceedings in the district court and to the evidence offered in support of its motion to terminate the derivative claims.[10] Continental argues that there is no recognized right of public access to pretrial proceedings in civil cases.[11] Without commenting on the correctness of Continental's position as a general matter, we cannot agree that the presumption does not apply to a motion to terminate. Continental's motion was designed to (and did) result in the dismissal of claims against several defendants. The district court was required to make complex factual and legal determinations in a proceeding which has been characterized as a "hybrid summary judgment motion." Zapata Corp. v. Maldonado, 430 A.2d at 787.[12] We hold, therefore, that the presumption of access applies to the hearings held and evidence introduced in connection with Continental's motion to terminate.
 
 
 21
 We further find, for several reasons, that Continental's withdrawal of the motion is immaterial to whether the presumption of access applies to the Report. It is significant that the motion was withdrawn at least consistently with the district court's "tentative impressions" which, as we have previously observed, were very unlikely to change to a position more congruent with the recommendations of the Report. Continental had put on its entire case, and it withdrew the motion to terminate only after the district court announced that, with respect to certain Bank officer defendants and the outside auditors, Continental had failed to meet its burden. Further, the motion was not withdrawn until after the plaintiffs agreed to dismiss those defendants with respect to whom Continental had met its burden. Thus, despite Continental's arguments to the contrary, the practical effect of Judge Grady's announcement of his tentative impressions was much the same as a ruling on the motion. We therefore find that all of the policies favoring public scrutiny of judicial decision-making apply to this case.[13] Further, the presumption of access normally involves a right of contemporaneous access: disclosure of the contents of the Report would have been proper at the time the motion was still pending. See In re Oliver, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682 (1948); United States v. Dorfman, 690 F.2d at 1232; United States v. Myers, 635 F.2d 945, 952 (2d Cir.1980).
 
 
 22
 B. The Effect of the Protective Order and Seal
 
 
 23
 Continental claims that the protective order agreed to by the parties and entered by the district court on January 7, 1983, coupled with the May 13, 1983 order requiring production of the Report to plaintiffs' counsel and the court, renders the presumption of public access inapplicable to the Report. In this connection, we note that the May 13 order specifically provided that production would not defeat any claim of privilege applicable to the Report. But, Continental urges that the only relevant inquiry is whether "good cause" existed for initially placing the Report under seal. The district court presumably found such "good cause" when it held, in its May 12 order, that the Report must be produced but only under seal.
 
 
 24
 Initially, we question whether the prior orders of the district court are relevant to whether the Newspapers may have access to the Report. The initial protective order of January 12 was entered, by its terms, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure. Rule 26(c) allows a party, for "good cause shown" to seek protection from discovery. The conditions imposed on production of the Report in the May 13 order appear, from the order itself and from the transcript of proceedings, to relate only to the desire of the plaintiffs to discover the Report. Neither the January order, the May order, nor Rule 26(c) purports to control disclosure of material introduced as evidence in support of a motion. Continental does not claim that it was required, through discovery process, to introduce the report into evidence at the June 30 hearing. Continental did not refer to the protective order or seal when it offered the Report as evidence. Thus, the concerns that underlie Rule 26(c)--namely protection from involuntary disclosure by a party or person "from whom discovery is sought"--do not appear to be implicated by the district court order requiring public disclosure of the Report after it was introduced as evidence.
 
 
 25
 In addition, the May 13 order itself adds little support to Continental's claim that our only inquiry should be into whether "good cause" existed for a protective order prior to the Report's production to the plaintiffs and the district court. The May order, in fact, contains no finding of good cause for a protective order. And, as noted, it does not purport to protect the Report from public disclosure as evidence if it were introduced at the June 30 hearing. Rather, the May order purports only to restrict the use to which the plaintiffs might put the Report and it provides that production pursuant to the order does not waive any privilege associated with the Report. Continental has not contended that it sought or received any guidance from the district court on the consequences of offering the Report as evidence at the June 30 hearing. Thus the order of May 13 cannot be fairly read to produce the effect Continental seeks. Further, this is not a case in which the recipient of protected discovery material introduced it into evidence; in such a case the protective order might have a wholly different significance.
 
 
 26
 In addition to these considerations, the protective order itself and the order entered by Judge Grady to accompany the protective order further undercut Continental's argument for a "good cause" standard. Paragraph 10 of the protective order, Continental Appendix p. 52, provides, in pertinent part, "[n]othing herein shall be construed as placing the burden [of justifying an order declassifying a document] on the party seeking to declassify any documents." While we recognize that the Newspapers are not parties to the litigation, and therefore not parties to the protective order, this provision indicates that Continental could only have understood from the outset that the protective order did not affect the legal standard applied to subsequent requests to make documents public. Further, Judge Grady's "Order Explaining Limitations of Protective Order" entered on January 7th to accompany the protective order provides, "In short, the parties must understand that the protective order does not insulate the information from disclosure if disclosure is otherwise proper under applicable rules of law." (Emphasis added).
 
 
 27
 It appears, therefore, that "good cause" for the protective order, in the sense used by Continental, was never shown. Given the circumstances surrounding entry of the protective order, if Continental believed that the protective order would protect its interest in confidentiality of the Report, even after it introduced it into evidence at the June 30 hearing, that belief was unreasonable.[14] Cf. Brown & Williamson Tobacco Corp. v. FTC, 710 F.2d at 1180 (confidentiality agreement between parties does not affect public's right of access to court documents).
 
 
 28
 Continental has not brought any case to our attention in which a court has applied the standard it seeks here. In fact, upon close analysis, use of the "good cause" standard Continental urges would apparently lead to quite unacceptable results.[15] Continental's argument would seemingly require us to keep material sealed even if "good cause" for unsealing existed, so long as the initial protective order had been properly entered.[16] District courts, under Continental's standard, in deciding whether to enter protective orders, would seemingly have to anticipate the possibility that, in the distant future, disclosure might be desirable, or required. This would cause major disruptions in the district courts' ability to exercise their discretionary powers over discovery and might make courts unwilling to enter protective orders in the first instance. Such a view of the effect of a protective order is too far-reaching for us to adopt.
 
 
 29
 Continental's contention that the presumption of access does not apply because the Report was admitted into evidence while under a protective order is similarly unavailing. As noted, the terms of the protective order and Judge Grady's explanatory order cast substantial doubt on any claim that the protective order should alter the legal standard for public disclosure of the material. Further, this case is in a different posture from the usual case in which access to sealed evidence has been denied. In most cases, the material sought has been produced to the court only under compulsion of a court order. Continental quotes Judge Friendly's statement that "we entertain no doubt as to the constitutionality of a rule allowing a federal court to forbid the publicizing, in advance of trial, of information obtained by one party from another by use of the court's processes." International Products Corp. v. Koons, 325 F.2d 403, 407 (2d Cir.1963). While we recognize the persuasiveness of Judge Friendly's view, we fail to see its relevance to publicizing information voluntarily offered into evidence by a party whose possession of the information in no way depended on use of court process.
 
 
 30
 We do not think that United States v. Myers, 635 F.2d at 952 n. 4, requires a contrary conclusion. In Myers, journalists sought to copy videotapes which had been played in open court. The journalists had already been given transcripts of the audio portion of the tapes. The Second Circuit, while granting access to the tapes, noted that the presumption of access would not apply to evidence entered under seal because, "with respect to that item of evidence, the session of court was not public." Id. Aside from the fact that these comments are pure dicta, there being no seal in Myers, it strains credulity to contend that the session of court in this case was not public with respect to the Report. The courtroom was open to the public, the witnesses repeatedly referred to the contents of the Report and excerpts from the Report were quoted by counsel in open court. The Second Circuit's further observation in Myers is therefore germane to the case at hand.
 
 
 31
 Once the evidence has become known to the members of the public, including representatives of the press, through their attendance at a public session of court, it would take the most extraordinary circumstance to justify restrictions on the opportunity of those not physically in attendance at the courtroom to see and hear the evidence, when it is in a form that readily permits sight and sound reproduction.
 
 
 32
 Id. at 952 (footnote reference omitted). Of course, the entire Report as a coherent whole was not publicly disclosed at the hearing here, but enough of it was disclosed to make the Second Circuit's comments relevant. Further, we recognize that Continental may have been under the impression that the protective order and its other efforts to keep the contents of the Report secret would shield the Report from the presumption of access, even when it was introduced into evidence and relied on to make a decision. But the limitations on the protective order and the selective public references to the contents of the Report at the hearing render that impression legally incorrect.
 
 
 33
 C. The Balance Between the Presumption of Access and Continental's Interest in Confidentiality
 
 
 34
 Having concluded that the presumption of access applies to the Report, we must balance the public interest underlying that presumption against Continental's interest in confidentiality. See Crystal Grower's Corp. v. Dobbins, supra. Continental has identified three factors on its side of the balance: attorney-client privilege, work product immunity and effective functioning of special litigation committees. Amicus Curiae, Chicago Clearing House Association, adds to that list the need for bank officials to "observe their high standards of accountability and to maintain the soundness and public confidence which is necessary to [banking] institutions." Brief for Amicus Curiae at 13. These interests, according to the amicus, would be threatened if special litigation committee reports were made public.
 
 
 35
 In undertaking a balancing test, we are mindful of the difficulty of weighing the important first amendment interests that cut in favor of disclosure. Therefore, we must be firmly convinced that disclosure is inappropriate if we are to reject demands for access. Under the circumstances before us, doubts must be resolved in favor of the Newspapers.
 
 
 36
 Initially, we think we need not remand for findings by the district court. Judge Grady has not made findings on the appropriate weight to be accorded the various interests in the balance. While better practice would dictate more specific findings, no case has been cited to us which holds that appellate review is precluded by the failure to accompany a disclosure order with findings. In United States v. Criden, 648 F.2d 814 (3d Cir.1981), the court applauded the district court for "clearly and succinctly express[ing] the bases for his decision denying release." Id. at 818 (emphasis added). In United States v. Edwards, supra, this court found, in the context of a denial of access to audio recordings in evidence at a criminal trial, "that it is vital for a [district] court to state the basis for its ruling, so as to permit appellate review of whether relevant factors were considered and given appropriate weight." Id., 672 F.2d at 1294. In the future, we think it very desirable for district courts to heed Judge Fairchild's call in Edwards for express findings.[17] However, given our view of the balance in this case, a remand is unnecessary.
 
 
 37
 With respect to the weight of the respective interests, in Crystal Grower's Corp. v. Dobbins, supra, the Tenth Circuit identified the factors weighing in favor of public disclosure of court documents.
 
 
 38
 First is the general interest in understanding disputes that are presented in a public forum for resolution. Second is the public's interest in assuring that the courts are fairly run and judges are honest.
 
 
 39
 Id., 616 F.2d at 461. See also Joy v. North, 692 F.2d 880, 893 (2d Cir.1982) (without public disclosure "confidence in the administration of justice would be severely weakened"), cert. denied, --- U.S. ----, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). We add to this side of the balance the public's right of access, guaranteed by the first amendment, to information before the court relating to matters of public interest.
 
 
 40
 As noted, it is difficult to attach specific weights to these interests. Public scrutiny of the judicial process has been held vital to the functioning of the courts. While sealing of one document in one case may not have a measurable effect on confidence in judicial integrity or on the effective operation of the courts, the effect of a consistent practice of sealing documents could prove damaging. Further, when claims for disclosure are based, at least in part, on the first amendment, there is a tradition of openness in this country that cannot be taken lightly. Therefore, we agree with the Second Circuit, that special litigation committee reports used in the adjudication stages of derivative litigation should be available for public inspection unless exceptional circumstances require confidentiality. Joy v. North, 692 F.2d at 893.
 
 
 41
 On Continental's side of the balance we turn first to the "public interest expressed in the doctrines of attorney-client privilege and work product immunity; a decision circumventing these doctrines poses a significant threat to the free flow of communications between clients and their attorneys and inhibits the ability of lawyers to adequately prepare their clients' cases." Crystal Growers, 616 F.2d at 461. We may assume for the purposes of this appeal that, because the Report here was prepared by the SLC and its counsel by way of preparation for litigation, it was protected as "work product" by FED.R.CIV.PRO. RULE 26(b)(3). We may further assume that, because the Report, in large part, consists of communication between the SLC and its counsel, it was protected against disclosure at the time of preparation by the attorney-client privilege.
 
 
 42
 In Joy v. North, supra, the court held that the attorney-client privilege and work product immunity were waived when the special litigation report was used in support of a motion to dismiss a derivative suit. Id. at 894. That holding is in keeping with the general rule that protection from disclosure is available only when the party asserting a privilege has maintained confidentiality.[18] See Permian Corp. v. United States, 665 F.2d 1214, 1222 (D.C.Cir.1981); United States v. A.T. & T., 642 F.2d 1285, 1299 (D.C.Cir.1980); Maryville Academy v. Loeb Rhoades & Co., 559 F.Supp. 7, 9 (N.D.Ill.1982). In the case before us, however, we need not go so far as to hold that the privileges are waived.[19] Continental did attempt to limit disclosure of the Report and may have been under the impression that the May 12 order protected the claim of privilege even after the Report had been introduced into evidence. However, we attach less weight to the public interest in the attorney-client privilege and work product immunity in the case before us than in a case where absolute confidentiality had been maintained. There is little interest in the confidentiality of documents which have been publicly discussed by their custodian. Such public discussion is a fair characterization of what occurred at the June 30 hearing. Therefore, while we agree with Continental that the public interest in preservation of the attorney-client privilege and work product immunity is a significant factor to be weighed against disclosure, we find that this interest carries less weight here than it would in a case in which strict confidentiality had been maintained.[20]
 
 
 43
 Continental also argues that confidentiality is required because otherwise the Report will be used against it in other litigation. The discoverability of the Report in these other cases is, according to Continental, presently unresolved. We have some reason to doubt that the question whether third parties may use the report in litigation against Continental is, in strict contemplation, legally relevant to the decision whether the Report should be disclosed. Whether the material is damaging is a consideration apart from attorney-client privilege or work product immunity. And there is no general privilege, analogous to the fifth amendment's protection against self-incrimination, that protects against disclosure of information that may lead to civil liability. As a common sense matter, however, we might have greater reluctance to require disclosure if the Report were clearly and significantly damaging to Continental. Having read the Report, however, we do not believe that this is the case.[21]
 
 
 44
 We are also unpersuaded by Continental's contention that we should protect the functioning of special litigation committees in furthering the ability of corporations to determine their own best interests with respect to derivative suits. Amicus Chicago Clearing House Association makes a similar argument with regard to its member banks' ability to conduct necessary internal investigations. Both argue that the ability to conduct investigations will be lost if the people questioned are aware that their answers may be made public. Again, beyond the attorney-client privilege and work product immunity, we have not been directed to any authority which recognizes this generalized right of confidentiality as a factor to be weighed against disclosure.[22] In Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir.1978) (en banc), the court held that disclosure of material similar to the Report pursuant to an SEC subpoena constituted only a limited waiver of the attorney-client privilege. Id. at 611. The court noted that a contrary conclusion would make it more difficult for a corporation to conduct an independent investigation of the merits of litigation. Id. The court did not hold, however, that this interest in independent investigations gives rise to a general right to confidentiality, independent of the attorney-client privilege. We also decline to create such a privilege for internal corporate affairs. We note, however, that in this case Continental might have guarded the confidentiality of the Report more carefully.
 
 
 45
 We agree that the device of a special litigation committee to conduct an investigation and make a report may be useful in handling derivative litigation. We recognize that confidentiality may advance this process. But when the report is used in an adjudicative procedure to advance the corporate interest, there is a strong presumption that confidentiality must be surrendered.
 
 
 46
 We also do not understand why public confidence in the banking industry would be undermined by disclosure of the Report. Certainly, an open airing of the issues surrounding the litigation would be more conducive to public confidence than a secret report which led to dismissal of various claims. See Joy v. North, 692 F.2d at 893. In any event, the public confidence factor is one that is too elusive to be given much weight in the context of this appeal.
 
 
 47
 Our assessment of all the relevant factors leads us to the conclusion that the district court did not abuse its discretion in ordering disclosure of the Report. This may impose some burdens on corporations in attempting to evaluate the merits of derivative suits and in assuring that the corporations' best interests are served by such derivative litigation. We are confident, however, that procedures can be developed whereby these interests can be accommodated. We are not adopting a per se rule of disclosure of special litigation committee reports whenever a motion to terminate is brought. Further, we do not mean to foreclose a district court from maintaining confidentiality in an appropriate case. We do conclude, however, in the context of this case, that the presumption of public access to court documents has not been rebutted.
 
 
 48
 Therefore, the order of the district court is affirmed.
 
 
 49
 PELL, Circuit Judge, concurring in part and dissenting in part.
 
 
 50
 The focus of this appeal as set forth in the majority opinion is the extent to which the media should be allowed access to certain documentary materials submitted under seal in the district court in connection with consolidated derivative actions in that court. While I disagree with the result reached in the majority opinion on the confidentiality question, and accordingly dissent therefrom, I think that the focus has been misdirected and that the confidentiality issue should never have risen to the level of being considered because, in my view, the district court misconceived the applicable law of Delaware under which the appellants (Continental) sought dismissal of the consolidated derivative actions. While I concur in that part of the opinion finding jurisdiction of the appeal, I respectfully dissent from the balance of the opinion for the reasons stated herein.
 
 
 51
 The appellants are Delaware corporations. Burks v. Lasker, 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979), held that the authority of disinterested directors to terminate shareholder derivative litigation brought against some of the company's directors and others is governed by applicable state law. The most recent pronouncement of the Delaware Supreme Court on a situation similar, but not identical, to that in the present case is Zapata Corp. v. Maldonado, 430 A.2d 779 (Del.1981). That case and Joy v. North, 692 F.2d 880 (2d Cir.1982), cert. denied, --- U.S. ----, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983), figure prominently in the proceedings both in the district court and in this court. These proceedings are sufficiently outlined in the majority opinion and need not be repeated here other than to emphasize that they involve an Independent Investigation Committee, the independence of which is not challenged, which sought under authority of Delaware law pursuant to the "Business Judgment Rule" to require the termination of derivative actions.
 
 
 52
 The derivative action has been termed a legal oddity "thought by many to be an endangered species as a consequence of the evolution of special litigation committees." Joy at 885. Joy, however, as well as the decision of the district court and this court in the present litigation, appear to me to take any real vitality out of the use of the special investigation committees and to shift the endangered species status from derivative actions to the committee procedure directed toward them. That derivative actions should not be regarded favorably when in conflict with the business judgment rule seems obvious to me. As the court pointed out in Joy, 692 F.2d at 887, shareholder plaintiffs are quite often little more than a formality for purposes of the caption rather than parties with a real interest in the outcome because at best they realize only an appreciation of the value of their shares which might be substantial in a close corporation but are of dubious benefit in the present case. The plain fact, as the Joy opinion points out, is that the real incentive in bringing the actions is usually not the hope of the return to the corporation but the hope of handsome fees to be recovered by plaintiffs' counsel. Further, the Joy majority opinion observed:
 
 
 53
 Derivative suits may be brought for their nuisance value, the threat of protracted discovery and litigation forcing settlement and payment of fees even where the underlying suit has modest merit. Such suits may be harmful to shareholders because the costs offset the recovery. Thus, a continuing debate surrounding derivative actions has been over restricting their use to situations where the corporation has a reasonable chance for benefit.
 
 
 54
 Id. at 887.
 
 
 55
 Notwithstanding the expression of such a dim view of derivative actions, the Joy majority in a wide ranging, non-elliptical, dissertative opinion, dealing not with Delaware law but Connecticut law, and without any real pertinent authority from that state, ventured to predict as Connecticut law that there is no reason to treat the recommendation of such committee as having presumptive weight or to accord it deference beyond its inherent persuasiveness. The result of this conclusion was that a court should scrutinize the committee's recommendation to determine independently whether the action was likely to harm the corporation rather than to help it. This, of course, results in the situation in which the committee found itself in the present case of having in effect to try the merits of the derivative action rather than going only so far as showing independence, good faith, and reasonable investigation, which latter standard is the view to which I subscribe and which I believe is consistent with Delaware law, whether or not it is consistent with Connecticut law which was not involved in the present case. Judge Cardamone in his dissent pointed out the speculative nature of the majority's opinion in predicting what the Connecticut Supreme Court might do in the future. Id. at 897.
 
 
 56
 I am devoting some attention, perhaps more than it merits, to Joy because it in part relies on, but I think misreads, Zapata and because it figures so prominently in the majority opinion of this court. The Joy majority apparently had no difficulty in brushing aside what I regard as a well reasoned opinion written by Judge Hugh Jones of the New York Court of Appeals, Auerbach v. Bennett, 47 N.Y.2d 619, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979), applying the law of Connecticut's neighboring state of New York to the recommendations of a special litigation committee. The holding in Auerbach was that the business judgment rule limits judicial scrutiny of the recommendation of special litigation committees to their good faith, thoroughness, and independence. Further, the court said:
 
 
 57
 While the court may properly inquire as to the adequacy and appropriateness of the committee's investigative procedures and methodologies, it may not under the guise of consideration of such factors trespass in the domain of business judgment.
 
 
 58
 Id., 419 N.Y.S.2d at 929, 393 N.E.2d 1002. The dissenting judge in Joy would have adopted the Auerbach analysis. Both he, however, and the majority expressed the view that Zapata reached a different result in the committee situation in applying the business judgment rule. As I will explore more fully, I disagree that Zapata reached a different result.
 
 
 59
 Both opinions apparently thought, as the district judge here thought, that in the committee situation, even though it is an independent one, the Zapata "two-step" procedure was applicable which required in the discretion of the judge the exercise of the judge's independent business judgment. In urging the adoption of the Auerbach rule Judge Cardamone aptly wrote of an underlying policy consideration supporting the Auerbach decision:
 
 
 60
 Even more fundamentally unsound is the majority's underlying premise that judges are equipped to make business judgments. It is a truism that judges really are not equipped either by training or experience to make business judgments because such judgments are intuitive, geared to risk-taking and often reliant on shifting competitive and market criteria. Auerbach, 47 N.Y.2d at 630, 419 N.Y.S.2d 920, 393 N.E.2d 994 (courts are "ill-equipped" to make essentially business judgments). Reasons of practicality and good sense strongly suggest that business decisions be left to businessmen. Whether to pursue litigation is not a judicial decision, rather, it is a business choice. Burks v. Lasker, 441 U.S. 471, 487, 99 S.Ct. 1831, 1842, 60 L.Ed.2d 404 (1979) (Stewart, J., concurring) ("A decision whether or not a corporation will sue an alleged wrongdoer is no different from any other corporate decision....").
 
 
 61
 692 F.2d at 898.
 
 
 62
 What I find even more startling in the examination of Joy is the majority's failure to mention another opinion, the case also in the Second Circuit but by a different panel, Abramowitz v. Posner, 672 F.2d 1025 (2d Cir.1982). Abramowitz was decided on February 9, 1982, and Joy was decided on November 4, 1982. It appears to me that there is a fundamental contradiction between the two cases, the only difference being that Abramowitz involved Delaware law and, of course, as I have already observed, Joy involved Connecticut law or what the court predicted Connecticut law would be. Both cases relied on Zapata. The only reference to Abramowitz is in the dissenting opinion of Judge Cardamone where he cites a case as one of a number of cases that have followed Auerbach 's teaching that an unbiased board's power to terminate derivative litigation is essentially unreviewable, observing with regard to both Abramowitz and Galef v. Alexander, 615 F.2d 51 (2d Cir.1980):
 
 
 63
 Our own Court eschewed second-guessing by the courts of what is the responsibility of a corporate board of directors and, until today, may properly have been included in the above group. Galef v. Alexander, 615 F.2d 51 (2d Cir.1980); Abramowitz, supra.
 
 
 64
 Joy at 900 n. 3.
 
 
 65
 That the Abramowitz panel correctly differentiated between the demand cases and the non-demand cases is evidenced by the fact that on the same day Abramowitz was decided the same panel released its decision in Maldonado v. Flynn, 671 F.2d 729 (2d Cir.1982). In Maldonado the same parties were involved who eventually were involved with the Zapata case in the Delaware Supreme Court. In other words, in Maldonado where there was no demand but demand was excused due to futility, the second step of the application of independent business judgment was required.
 
 
 66
 This brings me to an analysis of the decision in Zapata insofar as it is applicable to the present case. I agree, and I will parse Zapata in more detail subsequently in support of that agreement, with the analysis of Delaware law as exemplified in Zapata given by the Abramowitz court.
 
 
 67
 In sum, whether and how Delaware law permits disinterested independent directors of a corporation to seek termination of derivative litigation brought to redress alleged impropriety by other directors depends upon the type of case. Where demand upon the corporation has been made and refused, a court will defer to the company's business judgment to forgo litigation unless the shareholder can show that the directors acted wrongfully. Where demand has not been made due to futility, however, the company bears the initial burden of establishing its good faith and independence in seeking termination, and even then, its judgment is subject to the court's objective scrutiny.
 
 
 68
 Abramowitz, 672 F.2d at 1031.
 
 
 69
 In the case before us, a demand was made on the corporation and was refused. Turning directly to Zapata, the case for decision before that court was one in which no demand had been made. The Delaware Supreme Court in reviewing the law applicable to Delaware corporations summarizes the situation where a demand has been made and refused as follows:
 
 
 70
 As we noted, the question has been treated by other courts as one of the "business judgment" of the board committee. If a "committee, composed of independent and disinterested directors, conducted a proper review of the matters before it, considered a variety of factors and reached, in good faith, a business judgment that [the] action was not in the best interest of [the corporation]", the action must be dismissed. See, e.g., Maldonado v. Flynn, supra, 485 F.Supp. at 282, 286. The issues become solely independence, good faith, and reasonable investigation. The ultimate conclusion of the committee, under that view, is not subject to judicial review.
 
 
 71
 Zapata, 430 A.2d at 787. The court then goes ahead to express the point that this is not an acceptable stopping point because "there is sufficient risk in the realities of a situation like the one presented in this case to justify caution beyond adherence to the theory of business judgment." Id. (Emphasis added.) The reference to "this case" by necessity refers to the case before the court where demand was not made and the independent directors had had no opportunity to consider the demand. This is made clear by the next sentence which is that the "context here is a suit against directors where demand on the board is excused." Id. (Emphasis added.) Thereafter, the court proceeded to establish ground rules for the decision in the case before it where a demand had not been made but was excused. That the court was continuing to differentiate the two types of cases is clear from a subsequent extract from the court's opinion:
 
 
 72
 Whether the Court of Chancery will be persuaded by the exercise of a committee power resulting in a summary motion for dismissal of a derivative action, where a demand has not been initially made, should rest, in our judgment, in the independent discretion of the Court of Chancery. We thus steer a middle course between those cases which yield to the independent business judgment of a board committee and this case as determined below which would yield to unbridled plaintiff stockholder control.
 
 Id. at 788. (Emphasis added.)[1]
 
 73
 Perhaps the Delaware court could have made it even clearer that they were differentiating between the two types of cases, but as I read Zapata, the court was saying that it was already firmly established in Delaware law that the business judgment prevailed in the demand case but that in the case in which the stockholders proceeded to file a derivative suit without making a demand first on the corporation to take action that a second step resting in the independent discretion of the judiciary was necessary. If this had been done, the court in Joy and the district court in the present case would not hopefully have pursued the false trail of the second step involving the exercise of the trial judge's business judgment, a capacity possibly subject to question no matter how learned a particular judge may be in the affairs of the business world. If the district court in the present case handled this case as a demand-refused case, I have little doubt that the court would have found that the procedure adopted by Continental met the test which I regard as being the Delaware test. As the judge himself stated on June 30, 1983: "I believe I would find on the basis of what I heard so far that the committee was independent, that it acted in good faith, and with the exceptions I have noted, it performed an adequate investigation."
 
 
 74
 Turning back to the pronouncement from the bench preceding this observation to determine what he regarded as the exceptions to the performance of an adequate investigation, these apparently relate primarily to Harper who allegedly engaged in an insider's sale of stock and to Ernst & Whinney. The deficiency on Harper seems at best to be a second-guessing of the committee in what amounts to judicial second-hand determination of credibility. The second deficiency noted by the judge related to Ernst & Whinney as to which the committee had engaged Price Waterhouse as its accounting consultants. The district judge who was to exercise his business judgment stated "I know nothing about Price Waterhouse other than what I have heard here." I query whether the judge meant that literally. The remainder of the expressions of the judge leading up to his questioning the adequacy of the investigation relate to what can only be regarded as business policy matters not germane to the adequacy of the investigation.
 
 
 75
 If the district court, as I think it should have, had terminated the pending derivative suits, it having been established satisfactorily that the committee was composed of independent and disinterested persons who had reached in good faith a business judgment that the action was not in the best interest of the corporation, the matter of the confidentiality of the report would not have been reached as the demands which the media are attempting to get here were only pertinent to the merits of the derivative suits if they had been permitted to proceed. That did not happen, however, because of the position that the district judge took and the appellants were compelled to go forward with more specific details over and above showing enough to establish independence, good faith, and adequacy. I, therefore, would have reversed on the basis that the court should have dismissed the derivative suits and that the records of the committee's report and supporting documents under the applicable Delaware rule were not properly before the court and were not subject to disclosure.
 
 
 76
 Even if the confidentiality issue were otherwise reachable at this time, I would disagree with the result that the majority has reached. The report was submitted under seal. The phrase "under seal" would seem to me to be a term of art, a closed door to public dissemination because of the limited status under which they were brought into the proceedings. Gertrude Stein's memorable rose reference is applicable here. When the appellants found that they were going to have to try in effect, and even though in miniature, the merits of the derivative suits in proceedings which were supposed to be merely to determine whether the derivative suits could be disposed of in a summary proceeding, they quite foreseeably abandoned the proceedings which were going beyond the realm that should have been applicable to them. The reports and accompanying documents still bearing the imprimatur of being sealed should have departed the scene with appellants.
 
 
 
 [1]
 These cases arose, in large part, out of the widely publicized losses realized by Continental in connection with its dealings with the Penn Square Bank of Oklahoma City. These suits are still pending in the district court. The class action counts of the consolidated complaint allege violations of the Securities Exchange Act of 1934 and regulations promulgated thereunder, as well as common law fraud. The derivative counts assert claims against various Continental officials as well as against the accounting firm of Ernst & Whinney
 
 
 [2]
 The parties do not agree on the standard for court approval of dismissal. See infra note 3
 
 
 [3]
 Continental strongly disagrees with the interpretation of Maldonado by the district court. Continental argues that because demand to bring suit was made of Continental's directors, under Delaware law, the SLC's conclusions should be upheld if "the SLC was independent and acted in good faith and on the basis of a reasonable investigation." Brief for Appellants at 11, footnote. In Maldonado, demand was excused because it would have been futile and the Delaware Supreme Court held that, in addition to requiring the SLC to prove good faith, independence and reasonableness in conducting the investigation, the court should exercise "its own independent business judgment" to determine whether the claims should be pursued. Maldonado, 430 A.2d at 789. Judge Grady apparently concluded that the Maldonado standard should apply even where demand was made, though refused. We express no view as to the proper standard for the motion to terminate in this case. See infra note 12
 
 
 [4]
 The May 13 order requiring Continental to provide the court and plaintiffs with a copy of the Report expressly preserves for Continental any claim of privilege or work product immunity associated with the Report. However, the Newspapers' claim for access to the Report is predicated on the Report's introduction into evidence at the June 30 hearing and not on the district court's order requiring production of the Report as discovery material
 
 
 [5]
 Judge Grady also disagreed with the SLC's assessment of the merits of claims against Ernst & Whinney
 
 
 [6]
 See supra note 3
 
 
 [7]
 See Judge Grady's order granting access to the Report, entered on October 31, 1983. In that order Judge Grady held that only the materials he actually relied on were subject to disclosure. See infra note 8
 
 
 [8]
 The order disclosing the Report was stayed by the district court pending appeal. The Newspapers have not cross-appealed, so we decline to address the contention that the district court should release all of the evidence admitted at the June 30 hearing instead of only that evidence actually relied on by the district court
 
 
 [9]
 Justice Brennan notes both that public trials help insure accuracy of the fact finding process and that "mistakes of fact in civil litigation may inflict costs upon others than the plaintiff and defendant." Richmond Newspapers Inc. v. Virginia, 448 U.S. at 596, 100 S.Ct. at 2838 (opinion of Brennan, J.). The public interest in the litigation before us partakes of the general public interest in adequate and reliable information about securities and the securities markets. See SECURITIES AND EXCHANGE COMMISSION, REPORT OF SPECIAL STUDY OF SECURITIES MARKETS, pt. 1, at 9-19 (1963), reprinted in R. JENNINGS & H. MARSH, SECURITIES REGULATION, CASES AND MATERIALS 2 (5th ed. 1982). Investors depend on available information in making investment decisions; a more informed investment community presumably contributes to efficient functioning of the securities markets
 
 
 [10]
 The effect of the protective order and seal on the presumption of access is discussed infra, Part III-B. We express no view as to whether the presumption of access applies to materials used in other pretrial stages
 
 
 [11]
 A panel of the District of Columbia Circuit recently approved a district court order prohibiting disclosure of deposition transcripts not used at trial. See Tavoulareas v. The Washington Post Co., 724 F.2d 1010 (D.C.Cir.1984), vacated and rehearing en banc granted (Mar. 15, 1984). The panel held that the constitutional presumption of access does not apply to "discovery materials never used at trial." Id., 724 F.2d at 1017. In reaching its conclusion, the court relied on Nixon v. Warner Communications, Inc., 435 U.S. at 608-10, 98 S.Ct. at 1317-1318, for the proposition that "no constitutional right of access inheres either in the first or sixth amendment to copy and disseminate judicial records or evidence used at trial." Tavoulareas, 724 F.2d at 1017. The Tavoulareas panel may have read Warner Communications too broadly. The Court, in Warner Communications, merely held that the press's constitutional right of access to audio tapes played in court was not superior to that of the public. 435 U.S. at 609, 98 S.Ct. at 1318. The Court noted that "the press--including reporters of the electronic media--was permitted to listen to the tapes and report on what was heard. Reporters were also furnished transcripts of the tapes, which they were free to comment upon and publish." Id. Thus, the only "right" denied in Warner Communications was to make copies of the audio tapes; no general denial of the right of access was implicated by the Supreme Court's disposition of that case
 
 
 [12]
 Judge Pell, in dissent, argues forcefully that the district court misapplied Delaware law when it prescribed the standard governing Continental's motion to terminate. But we do not think it prudent, at this juncture, to consider whether the district court interpreted Maldonado correctly. See supra note 3. We believe that it is enough, for present purposes, that the district court applied the standard it thought appropriate and in so doing used the Report in arriving at its conclusions. A contrary conclusion would mean that the public would be forced to await appellate disposition before it could gain access to court documents, contrary to the tradition of contemporaneous access, discussed infra. Further, nothing in the record indicates that Continental attempted to take an interlocutory appeal of the district court's decision regarding the standard applicable to the motion to terminate. See 28 U.S.C. Sec. 1292(b). Moreover, contrary to the dissent's suggestion, Continental did not abandon the motion to terminate upon learning that a "mini-trial" would be held to determine whether the motion to terminate would be granted. Rather, Continental withdrew the motion when it learned that it had failed to meet its burden at the Step One hearing. This was more than three months after Judge Grady issued the order informing the parties of the standard he found applicable to the motion to terminate. And Continental used the Report to support its position on Step One. The dissent does not suggest that the Step One hearing, in which the SLC was required to prove the independence, good faith and reasonableness of its investigation, was erroneously held. Continental argues, merely, that only the Step One hearing should have been held. Thus, it is far from clear why, under the dissent's view of Delaware law, the Report would be any less a public document than it has become under Judge Grady's interpretation
 
 
 [13]
 The district court found that its tentative impressions "in part at least, resulted in the orders" dismissing the outside directors and withdrawing the motion to terminate with respect to the remaining defendants. Order entered October 31, 1983. Continental argues that it withdrew the motion to terminate in order to avoid the "mini-trials," which would, in any event, expose the sensitive information relating to the loans. We believe that Continental's actual motives for the withdrawal are not dispositive since, whatever the subjective circumstances, the public appearance was of conformance to Judge Grady's "tentative impressions." Further, Continental knew before introducing the Report that, under the May 6 order setting the legal standards to be applied to the motion to terminate, the plaintiffs would be allowed to challenge the substance of the SLC's conclusions. Thus, if Continental did not wish to participate in a "mini-trial," it could have withdrawn the motion to terminate after entry of the May 6 order, long before it introduced the Report into evidence
 
 
 [14]
 In a letter to this court, pursuant to Circuit Rule 11, Continental draws our attention to paragraph 7.11 of the American Law Institute's "Principles of Corporation Governance: Analysis and Recommendations, Council Draft No. 3." We note that the Draft bears the following legend:
 As an unpublished document intended for internal use, this draft should not be generally circulated or distributed, nor should it be quoted from or cited or its substance disclosed in any public address or writing.
 The Report in the case before us bore a similar legend. Continental's citation of the ALI draft to us, in apparent disregard of the legend, rather ironically highlights the unreasonableness of the belief it purports to have entertained about the confidentiality of the Report based on the protective order.
 
 
 [15]
 We do not understand Continental to be asking us to apply a "good cause" standard to the Newspapers' request to modify the protective order. The Eighth Circuit seems to have taken that approach when it held that material held under seal pursuant to a statutory requirement would be made public only if there existed "good cause" for unsealing. In re Application of Kansas City Star, 666 F.2d 1168, 1175 (8th Cir.1981). Kansas City Star and United States v. Dorfman, supra, are of questionable relevance here since they arose in connection with evidence sealed pursuant to Title III of the Federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. Secs. 2510-2520. These cases require good cause for unsealing material that was initially sealed pursuant to the Act
 
 
 [16]
 The Sixth Circuit may have taken a position somewhat analogous to Continental's in In re: The Knoxville News-Sentinel Co., 723 F.2d 470 (6th Cir.1983), but that case arose in such different circumstances that we find it almost wholly inapplicable here. In that case, a bank was allowed to remove from the court file documents containing personal financial records of its customers. Prior to filing suit, the bank had sought, and received, an order safeguarding the privacy interests of its customers. It relied on that order in deciding to file suit. In that situation, the Sixth Circuit found that the privacy interests of the customers provided the compelling reasons necessary to justify nondisclosure. Id., 723 F.2d at 474, 476-78. The Sixth Circuit also noted that the privacy interests of bank customers are protected by the Right To Financial Privacy Act, 12 U.S.C. Secs. 3401-3422, which provides for civil penalties against a financial institution disclosing financial records in violation of the Act
 By contrast, Continental raises no analogous personal privacy interest. Further, the documents in Knoxville were never used in adjudication. Finally, Continental did not seek, and receive, specific guidance on whether the Report would remain confidential despite its use as evidence; the bank in Knoxville, conversely, relied on specific district court assurances as to the continued privacy of the financial information of its customers. These distinctions, together with the factual differences arising from the level of secrecy maintained by the bank in Knoxville, indicate that we should adhere to the balancing approach generally applied to cases involving the presumption of access. See infra Part III-C.
 
 
 [17]
 Because a denial of access may amount to a denial of first amendment rights, it is perhaps more important that findings accompany a denial than a grant of access. Nevertheless, we think findings in all cases are desirable
 
 
 [18]
 The District of Columbia Circuit has held that partial disclosure of privileged material waives the privilege as to all other communications on the same subject; "selective disclosure waives the privilege." In re Sealed Case, 676 F.2d 793, 818 (D.C.Cir.1982)
 
 
 [19]
 Apparently the district court is still considering, for purposes other than the Newspapers' right of access, the applicability of the attorney-client privilege to the Report. If any such consideration is still appropriate, our comments may provide guidance
 
 
 [20]
 We also note the rule that a party waives the attorney-client privilege when the contents of the privileged communications are put in issue by the party asserting the privilege. See e.g., United States v. Woodall, 438 F.2d 1317, 1324 (5th Cir.) (en banc), cert. denied, 403 U.S. 933, 91 S.Ct. 2262, 29 L.Ed.2d 712 (1971); United States v. Mierzwicki, 500 F.Supp. 1331, 1335 (D.Md.1980)
 
 
 [21]
 On our reading, very little of the Report strikes us as materially damaging to Continental. We therefore find it surprising that Continental did not propose editing out portions of the Report that might be particularly sensitive
 
 
 [22]
 This case is distinguishable from cases involving evidence at criminal trials in another important respect: in the criminal context there is the constitutionally recognized right to a trial free from prejudicial publicity. See Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); United States v. Edwards, 672 F.2d at 1295-96; Belo Broadcasting Corp. v. Clark, 654 F.2d 423, 431 (5th Cir.1981)
 
 
 [1]
 Since the argument in this case, the Delaware Supreme Court decided Aronson v. Lewis, No. 203, 1983 (Del. March 1, 1984), which reaffirms the holding in Zapata with respect to the business judgment rule in non-demand cases