**In re The KNOXVILLE NEWS-SENTI-NEL COMPANY, INC., (83–5095).**

**In re KNOXVILLE JOURNAL CORPO-RATION and Tennessee Newspapers, Inc., (83–5096), Petitioners.**

Nos. 83–5095, 83–5096.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 1, 1983.

Decided Dec. 13, 1983.

Arthur L. Beamon, Werner Goldman, James L. Meador, Washington, D.C., for defendant FDIC.

Robert Bloom (argued), Brian D. Alprin, Washington, D.C., W.F. Shumate, Jr., Knoxville, Tenn., for plaintiff UAB.

Richard L. Hollow (argued), Robert H. Watson, Jr., Knoxville, Tenn., Bruce W. Sanford, Washington, D.C., for appellant in No. 83–5095.

Before ENGEL, MARTIN and CONTIE, Circuit Judges.

BOYCE F. MARTIN, Jr., Circuit Judge.

In this appeal, two Tennessee newspapers, intervening parties in the lawsuit between United American Bank and the Federal Deposit Insurance Corporation, are seeking a writ of mandamus. The newspapers request that we vacate an order of the district court which permitted the bank to remove from the court's record, prior to public inspection, two exhibits the bank had filed in its lawsuit against the FDIC.

On January 25, 1983, bank examiners of the FDIC, pursuant to their statutory authority to regulate federally-insured state banks, presented the bank officials with a list of 423 questionable loans in United American's portfolio. The list contained the names of borrowers and the amount of each loan. The bank responded by submitting to the FDIC a loan-by-loan defense of each of the 423 loans listed by the FDIC as questionable. This response contained extensive discussion of the borrower's financial condition, prospects and personal life.

During this time, stories were appearing in the Tennessee news media discussing the FDIC's concern over the bank's financial condition. Apparently in response to this media attention, the bank issued a press release on January 28, 1983 disclosing its fourth-quarter and year-end financial results for 1982. The figures relied upon in this press release came from an audit report prepared by the bank's own independent accountants. The press release did not mention the FDIC's list of questionable loans.

On February 4, 1983, the FDIC served on the bank a Temporary Order to Cease and Desist which required that:

Immediately upon service of this TEMPORARY ORDER TO CEASE AND DESIST, the Bank shall correct the false or misleading public statements disseminated by the Bank, or officers, directors, or employees of the Bank, on or about January 29, 1983.

The Bank shall file an amended consolidated Report of Condition and an amended consolidated Report of Income as provided under section 7(a) of the Federal Deposit Insurance Act (12 U.S.C. § 1817(a)) which shall accurately reflect the financial condition of the Bank as of December 31, 1982.

On February 8, the bank filed suit in the district court pursuant to 12 U.S.C. § 1818(c)(2), seeking an injunction to prohibit the FDIC from enforcing its Temporary Cease and Desist Order.

Upon filing, counsel for the bank was granted, *ex parte,* a protective order from the district court sealing the entire court record. At that time, the record contained the bank's complaint, ten exhibits, and responsive pleadings. Included among the ten exhibits were the FDIC's list of questionable loans, Exhibit 3, and the bank's loan-by-loan response, Exhibit 4. The protective order, dated February 8, barred all public access to the court file and ordered the parties to keep confidential any information derived from the court file. On February 11, the Knoxville News-Sentinel Co., whose reporters had been assigned to monitor the litigation between the bank and the FDIC, filed in this court a Petition for a Writ of Mandamus to vacate the protective order. On February 14, the Knoxville Journal Corporation and Tennessean Newspapers, Inc., also filed a Petition for a Writ of Mandamus. The newspapers argued that the lawsuit between the bank and the FDIC dealt with events and personalities of "immense public interest." They contended public access to the file was needed to facilitate further discussion and debate among the citizens of Tennessee about these important matters.

In a memorandum opinion dated February 11, 1983, the district court set forth its reasons for sealing the court record. First, the court noted the sensitive nature of the exhibits relating to the bank's customers and the bank's loan policy. The district court acknowledged the bank's contention that public disclosure "would result in the FDIC prevailing in the action before the issues are joined or any necessary hearing is held." In light of these circumstances, the court concluded there was authority to deny public access to the court file in order to "protect the interest of the Bank in this case."

On February 14, the Tennessee Commissioner of Banking ordered United American closed because of extensive loan losses, and appointed the FDIC as receiver of the bank. On February 15, the FDIC negotiated an agreement with the First Tennessee Bank of Knoxville to assume all the assets and liabilities of United American Bank. On the same day, the district court issued an order dismissing the lawsuit between United American and the FDIC. This order also lifted the February 8 protective order, but directed that Exhibits 3 and 4 be withdrawn from the court file and returned to counsel for the bank, "with the understanding that the exhibits will be preserved and submitted to the Sixth Circuit if requested by that Court." On February 18, the newspapers filed amended Petitions for a Writ of Mandamus in this court seeking an order vacating the February 15 order to the extent that it permits the removal of Exhibits 3 and 4 from the district court's records.

In our view, this appeal presents two separate issues:

(1) Did the district court's February 15 order, which dismissed the underlying lawsuit between the bank and the FDIC and provided for public access to the remaining documents in the court file, moot the newspapers' claims against the district court?

(2) Did the district court abuse its discretion by permitting counsel for the

bank to remove Exhibits 3 and 4 from the court's file?

Our conclusion after a review of the record indicates no abuse of discretion in ordering Exhibits 3 and 4 expunged from the record. We also find that the remainder of the newspapers' claims against the district court have been rendered moot.

Regarding the first issue, it is well established that we do not decide moot questions. *Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Here, the newspapers have requested that we instruct the district court to refrain from issuing orders similar to the order of February 8, 1983. They complain that such an order violates their common law and first amendment rights of access to judicial records. They argue that only definitive instructions from this court will prevent future protective orders from being issued. This we decline to do. *International Union, etc. v. Dana Corp.,* 697 F.2d 718 (6th Cir. 1983).

■ It is undisputed that the newspapers now have access to the court's entire file, except for Exhibits 3 and 4. Putting aside their right of access to these latter two exhibits, the newspapers are now in the same position they would have been had no protective order issued. There is no indication the district court intends to place future restrictions on the public's access to the file in this case. The record before us does not reveal a set of facts "of sufficient immediacy and reality" warranting a writ of mandamus. *Maryland Casualty Co. v. Pacific Coal and Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *United States v. Brooklier,* 685 F.2d 1162, 1173 (9th Cir.1982). Thus, we have before us "more than a 'mere voluntary cessation of allegedly illegal conduct' where we would leave the [district court] free to return to [its] old ways. As to the [newspapers'] original complaint, there is now 'no reasonable expectation that the [alleged] wrong will be repeated.'" *Preiser v. Newkirk,* 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (citations omitted); *Cf. City of*

*Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982).

As the facts stand now, further relief is unnecessary. The newspapers cannot point to any continuing harm or future threat that the district court will issue similar protective orders denying their right of access to the file in question. As stated in *United States v. SCRAP,* 412 U.S. 669, 688–689, 93 S.Ct. 2405, 2416–2417, 37 L.Ed.2d 254 (1973), "pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged [governmental] action, not that he can imagine circumstances in which he could be affected by [governmental] action." Speculative contingencies afford no basis for our granting relief. *Preiser v. Newkirk, supra,* 422 U.S. at 403, 95 S.Ct. at 2335; *Hall v. Beals, supra,* 396 U.S. at 49–50, 90 S.Ct. at 202.

The other issue in this case concerns whether the district court abused its discretion in ordering Exhibits 3 and 4 removed from its file prior to public inspection. In *Nixon v. Warner Communications,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the Supreme Court noted that "every court has supervisory power over its own records and files." This principle has been consistently applied by this court and the other circuits when reviewing a district court's handling of its records and files. *Brown & Williamson Tobacco Corp. v. FTC,* 710 F.2d 1165 (6th Cir.1983); *Krause v. Rhodes,* 671 F.2d 212 (6th Cir.1982), *cert. denied,* 459 U.S. 823, 103 S.Ct. 54, 74 L.Ed.2d 59 (1982); *Offices of Lakeside Non-Ferrous Metals, Inc. v. United States,* 679 F.2d 778 (9th Cir.1982); *FDIC v. Ernst & Ernst,* 677 F.2d 230 (2d Cir.1982); *United States v. Hubbard,* 650 F.2d 293 (D.C.Cir.1980).

■ Yet, the power to exercise "discretion" does not imply that discretionary powers can be exercised without restraint. A district court's determination on the sealing of its own record is "not insulated from review merely because the judge has discretion in this domain. The [d]istrict [c]ourt's

discretion is circumscribed by a long-established legal tradition." *Brown & Williamson*, 710 F.2d at 1177. This long-established legal tradition is the presumptive right of the public to inspect and copy judicial documents and files. *Nixon v. Warner Communications*, 435 U.S. at 597, 98 S.Ct. at 1311; *In Re Application of National Broadcasting Co., Inc., (United States v. Criden I)*, 648 F.2d 814, 819 (3d Cir.1981); *In Re Application of National Broadcasting Co., Inc., (United States v. Jenrette)*, 653 F.2d 609, 612 (D.C.Cir.1981); *In Re Application National Broadcasting Co., Inc., (United States v. Myers)*, 635 F.2d 945, 949 (2d Cir.1980); *United States v. Mitchell*, 551 F.2d 1252, 58–60 (D.C.Cir.1976), *rev'd on other grounds sub nom. Nixon v. Warner Communications*, supra. The recognition of this right of access goes back to the Nineteenth Century, when, in *Ex Parte Drawbraugh*, 2 App.D.C. 404 (1894), the D.C. Circuit stated: "Any attempt to maintain secrecy, as to the records of this court, would seem to be inconsistent with the common understanding of what belongs to a public court of record, to which all persons have the right of access." *Id.* at 407.

■ There are, however, important exceptions which limit the public's right of access to judicial records.

[T]he right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, or as sources of business information that might harm a litigant's competitive standing.

*Nixon v. Warner Communications*, 435 U.S. at 598, 98 S.Ct. at 1312 (citations omitted). Thus, trial courts have always been afforded the power to seal their records when interests of privacy outweigh the public's right to know. *Brown & Williamson*, 710 F.2d at 1179; *In Re Halkin*, 598 F.2d 176, 190–192 (D.C.Cir.1979); *Ottaway Newspapers, Inc. v. Appeals Court*, 372 Mass. 539, 362 N.E.2d 1189 (1977) (sealing of record at preliminary injunction stage of judicial proceedings between bank and state banking commissioner not an unconstitutional infringement on free press guaranty). But, as noted, the decision as to when judicial records should be sealed is left to the sound discretion of the district court, subject to appellate review for abuse.

■ In reviewing the district court's determination on this matter, we feel compelled to make two points. First, we note the failure of the district court to afford the press a reasonable opportunity to state their objections to its protective order. As noted by the Supreme Court in *Gannett Co., Inc. v. De Pasquale*, 443 U.S. 368, 401, 99 S.Ct. 2898, 2916, 61 L.Ed.2d 608 (1979) (Powell, J., concurring), *id.* at 446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part), and *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 2622 n. 25, 73 L.Ed.2d 248 (1982), "representatives of the press and the general public 'must be given an opportunity to be heard on the question of their exclusion.'" *See also United States v. Brooklier*, supra, 685 F.2d at 1168; *United States v. Criden II*, 675 F.2d 550, 558–59 (3d Cir. 1982); *Sacramento Bee v. United States District Court*, 656 F.2d 477, 481–482 (9th Cir.1981). *Gannett* involved a motion, made in open court, requesting the public and press be excluded from a pretrial suppression hearing in a murder prosecution. *Globe* concerned a motion, made during preliminary hearings, to exclude the public from the courtroom during the prosecution of a defendant charged with raping three minor girls. Writing for four Justices in *Gannett*, Justice Blackmun stated:

I would conclude that any person removed from a court should be given a

reasonable opportunity to state his objections prior to the effectiveness of the order. This opportunity need not take the form of an evidentiary hearing; it need not encompass extended legal argument that results in delay; and the public need not be given prior notice that a closure order will be considered at a given time and place. But where a member of the public contemporaneously objects, the court should provide a reasonable opportunity to that person to state his objection.

*Gannett,* 443 U.S. at 445–446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part). Justice Powell adopted a similar view in his concurring opinion.

Representatives of these groups must be given an opportunity to be heard on the question of their exclusion. But this opportunity extends no farther than the persons actually present at the time the motion for closure is made, for the alternative would require substantial delays in trial and pretrial proceedings while notice was given to the public. Upon timely objection to the granting of the motion, it is incumbent upon the trial court to afford those present a reasonable opportunity to be heard on the question whether the defendant is likely to be deprived of a fair trial if the press and public are permitted to remain in attendance.

443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J. concurring). *See also Globe Newspaper Co., supra,* 102 S.Ct. at 2622 n. 25. It is clear from these statements that persons present in open court have a right to be heard on the question of their exclusion.

■ The Third and Ninth Circuits have extended this right to be heard to cases where requests for closure are made to the trial judge in writing or during in-chambers conference when members of the public are not present. *Brooklier, supra; Criden II, supra.* Both of these courts have required that reasonable steps be taken to afford the public and press an opportunity to submit their views on the question of their exclusion before a closure motion is acted upon. *Brooklier,* 685 F.2d at 1168; *Criden II,* 675

F.2d at 559–560. We believe our holding in *Brown & Williamson, supra,* invites application of a similar rule where a district court is requested, either in writing under seal or during an in-chambers conference, to seal its record. *See Associated Press v. United States District Court,* 705 F.2d 1143, 1146 n. 1 (9th Cir.1983).

■ Like the district courts in *Brooklier* and *Criden I,* the district court below was well aware of the public's interest in the litigation between United American and the FDIC. After receiving the bank's request to seal the record, the district court had an obligation to consider the rights of the public and the press. In its memorandum opinion the district court acknowledged the interest of the public in disclosure, but found that interest subordinate to the interests of the bank. In our view, the district court should not be placed "in the position of sole guardian of first amendment interests even against the express wishes of both parties." Younger, *The Sheppard Mandate Today: A Trial Judge's Perspective,* 56 Neb.L.Rev. 1, 6–7 (1977), *quoted in Criden II,* 675 F.2d at 558. Rather, the public and press should be afforded, where possible, an independent opportunity to present their claims. "Certainly, the failure to invite participation of the party seeking to exercise first amendment [and common law rights] reduces the possibility of a narrowly drawn order, and substantially imperils the protection which the amendment [and the common law] seeks to assure." *Carroll v. President and Commissioners of Princess Anne,* 393 U.S. 175, 184, 89 S.Ct. 347, 353, 21 L.Ed.2d 325 (1968). The importance of the rights involved and interests served by those rights require that the public and press be given an opportunity to respond before being denied their presumptive right of access to judicial records.

■ In order to protect this right to be heard, the most reasonable approach would be to require that motions to seal be docketed with the clerk of the district court. The records maintained by the clerk are public records. If a party moves to seal a

document, or the entire court record, such a motion should be made "sufficiently in advance of any hearing on or disposition of the [motion to seal] to afford interested members of the public an opportunity to intervene and present their views to the court." *Criden II*, 675 F.2d at 559. The district court should then allow interested members of the public a reasonable opportunity to present their claims, without causing unnecessary or material delay in the underlying proceeding. *Brooklier*, 685 F.2d at 1168, citing *Gannett*, 443 U.S. at 401, 99 S.Ct. at 2916 (Powell, J., concurring), *id.* at 446, 99 S.Ct. at 2939 (Blackmun, J., concurring in part and dissenting in part). In this case, however, we believe the progression of events, including our own review, has sufficiently cured the district court's failure to afford the press an opportunity to be heard on the question of their exclusion, and we therefore deny mandamus relief on this issue.

 The second point we wish to make concerns the scope of our review. In light of the important rights involved, the district court's decision is not accorded the traditional scope of "narrow review reserved for discretionary decisions based on first-hand observations." *United States v. Criden I*, 648 F.2d at 818. Only the most compelling reasons can justify non-disclosure of judicial records. *Brown & Williamson*, 710 F.2d at 1179–80; *United States v. Myers*, 635 F.2d at 952. As stated by the D.C. Circuit:

> To say that discretion exists, however, is not to say, as appellee contends, that what is involved here "is simply a policy determination." Appellants seek to vindicate a precious common law right, one that predates the Constitution itself. While the courts have sanctioned incursions on this right, they have done so only when they have concluded that "justice so requires." To demand any less would demean the common law right.

*United States v. Mitchell*, 551 F.2d at 1260 (footnotes omitted). With these principles in mind, we conclude the district court did not abuse its discretion in ordering Exhibits 3 and 4 removed from the file.

The district court's order allowing removal of Exhibits 3 and 4 from its file properly protected the identity and privacy of customers of the bank whose names were included in the two exhibits. Congressional support for this action is reflected in statutory provisions and regulatory rules. The Right to Financial Privacy Act, 12 U.S.C. § 3401–3421, outlines numerous restrictions on the disclosure of financial records held by bank employees and federal regulatory authorities. The Act imposes an affirmative duty on the government and banking officials to safeguard the financial records of individuals utilizing the services of banks. Section 3417(a) enforces the Act's commands by allowing bank customers to recover civil penalties from "[a]ny agency or department of the United States or financial institution obtaining or disclosing financial records" in violation of the Act. In addition to the civil penalties permitted by 12 U.S.C. § 3417, Congress has also made it a federal crime for bank examiners, federal or private, to disclose information obtained in the course of examining a federally insured bank. 18 U.S.C. § 1906 expressly prohibits any bank examiner with access to the financial records bank customers from disclosing personal information discovered from those records.

Further Congressional recognition of the confidentiality of financial records is illustrated in 5 U.S.C. § 552(b)(8). This provision exempts from disclosure under the Freedom of Information Act information complied by government officials responsible for the regulation or supervision of financial institutions. As noted in *Consumers Union of United States, Inc. v. Heimann*, 589 F.2d 531, 534 (D.C.Cir.1978), the "primary reason for adoption of exemption 8 was to ensure the security of financial institutions." Without this exemption, there was Congressional concern that indiscriminate disclosure of financial records regarding the loan policies of banks "might undermine public confidence and cause unwarranted runs on banks." *Id.* at 534 (footnote omitted). Congress also recognized

the need to preserve the close relationship between banks and their supervising agencies. "If details of the bank examinations were made freely available to the public and to bank competitors, there was concern that banks would cooperate less than fully with federal authorities." *Id.* at 534. Furthermore, exemption 8 prevents the casual disclosure of customer financial data held by the government pursuant to their regulatory authority, thereby ensuring traditional concepts of confidentiality associated with personal banking records.

Finally, the confidentiality of financial records is recognized in regulations governing the disclosure of financial documents held by the FDIC. 12 C.F.R. § 309.5(f)(8) (1982) provides that "[r]ecords contained in or related to examination, operating, or condition reports by or on behalf of, or for the use of, the [FDIC] or any agency responsible for the regulation or supervision of financial institutions," are exempt from public disclosure. Similar provisions are applicable to the Comptroller of the Currency, 12 C.F.R. § 4.16(b)(8) (1982); Board of Governors of the Federal Reserve System, 12 C.F.R. § 261.6(a)(2) (1982); and the Federal Home Loan Bank Board, 12 C.F.R. § 505.-5(a)(2) (1982). The legality of these regulations has survived judicial scrutiny. *Denny v. Carey,* 78 F.R.D. 370, 372 (E.D.Pa. 1978), citing *United States ex rel. Touhy v. Ragen,* 340 U.S. 462, 71 S.Ct. 416, 95 L.Ed. 417 (1951). Viewed together, these statutory and regulatory provisions clearly indicate Congress' intention that the banking records of individuals be kept in strict confidence. The privacy interests embodied in those provisions identify a compelling government interest in preserving the secrecy of personal financial records. The February 15 order of the district court is narrowly tailored to serve that interest.

The strongest argument against the action of the district court is our decision in *Brown & Williamson Tobacco v. FTC,* 710 F.2d 1165 (6th Cir.1983). But this case is distinguishable. In *Brown & Williamson* this court refused to uphold a lower court's sealing of the record, notwithstanding the claim that public access to the file would hurt Brown and Williamson's business prominence. "Simply showing that the information would harm the company's reputation is not sufficient to overcome the strong common law presumption in favor of public access to court proceedings and records." *Id.* at 1179. Here, however, the district court's removal of Exhibits 3 and 4 was designed not to protect the business reputation of the bank, which no longer existed as a banking entity when the order was issued, but rather to protect the privacy rights of borrowers who dealt with the bank. Unlike the protected party in *Brown & Williamson,* who sought to deny public access because of the adverse business effect disclosure might cause, the individuals protected by the closure order here are third parties who were not responsible for the initiation of the underlying litigation. These individuals possessed a justifiable expectation of privacy that their names and financial records not be revealed to the public. Their interests in privacy are sufficiently compelling to justify non-disclosure. *United States v. Jenrette, supra,* 653 F.2d at 620 (interest in avoiding injury to innocent third parties properly weighed against broadcasters' right of access); *Application of American Broadcasting Companies,* 537 F.Supp. 1168, 1172–73 (D.D.C.1982); *Application of KSTP Television,* 504 F.Supp. 360, 363 (D.Minn.1980).

*Brown & Williamson* is distinguishable in another way. There, the court noted the public's strong interest in disclosure because the subject being litigated "potentially involves the health of citizens who have an interest in knowing the accurate 'tar' and nicotine content of the various brands of cigarettes on the market." *Id.* at 1180. *See also United States v. General Motors,* No. 83–2220, (D.D.C. Filed October 19, 1983) (public interest in disclosure of documents regarding auto safety outweighs defendant's interest in avoiding adverse publicity). Here, the newspapers can point to no analogous need of the public to know about the names and financial records of the bank's customers. While it is true the litigation between the bank and the FDIC involved matters of

"immense public interest," the "presumptively paramount" right of the public to know must be weighed against competing interests of privacy. *Nixon v. Warner Communications,* 435 U.S. at 598, 98 S.Ct. at 1312; *In Re Franklin National Bank Securities Lit.,* 92 F.R.D. 468–471 (E.D.N.Y.1981), aff'd, *FDIC v. Ernst & Ernst,* 677 F.2d 230 (2d Cir.1982); *United States v. Jenrette,* 653 F.2d at 620; *Crystal Grower's Corp. v. Dobbins,* 616 F.2d 458, 461 (10th Cir.1980). As noted in *Brown & Williamson,* the "privacy rights of participants and third parties" are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records. *Brown & Williamson,* 710 F.2d at 1179. Under the particular facts here, we find the privacy rights of these borrowers sufficiently compelling to warrant a restriction of the public's right to know.

Finally, we must take account of the bank's initial reliance on the district court's protective order. The bank asserts it was forced to file suit against the FDIC to protect its business interests. They contend, however, that their cause of action under 12 U.S.C. § 1818(c)(2) was initiated "only after" they obtained the protective order needed to safeguard the stability of the bank and privacy interests of its customers. Regardless of whether we accept the bank's version of the facts, or the newspapers' version (the protective order was issued simultaneously to the bank's filing), we do note that the bank placed significant reliance upon the protective order. Once placed in this position, only "extraordinary circumstances" or "compelling need" warrant the reversal of a protective order. *FDIC v. Ernst & Ernst,* 677 F.2d 230, 232 (2d Cir.1982) ("Once a confidentiality order has been entered and relied upon, it can only be modified if an 'extraordinary circumstance' or 'compelling need' warrants the requested modification.") The particular facts of this case indicate no extraordinary circumstance or compelling need warranting this court's issuance of a writ of mandamus.

 As stated in *In Re Traffic Executive Ass'n-Eastern Railroads v. Long Island R.R. Co.,* 627 F.2d 631, 634 (2d Cir.1980), "[t]his Court will not issue mandamus with respect to a discretionary order except in most extraordinary circumstances." *See also Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 35, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980), *In re Post Newsweek Stations, Michigan, Inc.,* 722 F.2d 325, 329–330 (6th Cir.1983). Accordingly, we deny the newspaper's petition for a writ of mandamus.