**FEDERAL TRADE COMMISSION,
Plaintiff, Appellee,**

v.

**STANDARD FINANCIAL MANAGEMENT CORP., et al., Defendants,
Appellees.**

**Dana J. Willis, Defendant, Appellant.**

**FEDERAL TRADE COMMISSION,
Plaintiff, Appellee,**

v.

**STANDARD FINANCIAL MANAGEMENT CORP., et al., Defendants,
Appellees.**

**Paul F. Taglione, Defendant, Appellant.**

Nos. 87–1340, 87–1357.

United States Court of Appeals,
First Circuit.

Argued June 4, 1987.

Decided Oct. 6, 1987.

Barry J. Cutler with whom Peter M. Kazon, O'Connor & Hannan, Washington, D.C., Alan M. Spiro and Friedman & Atherton, Boston, Mass., were on brief, for defendant, appellant Dana J. Willis.

Defendant, appellant Paul F. Taglione submitted on the brief of defendant, appellant Willis.

David C. Shonka with whom Phoebe D. Morse, Director, Raymond L. Betts, Boston, Mass., Robert D. Paul, Gen. Counsel, and Ernest J. Isenstadt, Asst. Gen. Counsel, Washington, D.C., were on brief, for plaintiff, appellee F.T.C.

Joseph D. Steinfield with whom Jeanne M. Kempthorne and Hill & Barlow, Boston, Mass., were on brief, for intervenor Globe Newspaper Co.

Brenda M. Cotter with whom Brown, Rudnick, Freed & Gesmer, Boston, Mass., was on brief, for defendant, appellee Standard Financial Management Corp.

Before COFFIN, DAVIS * and SELYA, Circuit Judges.

SELYA, Circuit Judge.

The United States District Court for the District of Massachusetts ordered the unsealing of sworn personal financial statements submitted to the Federal Trade Commission (FTC) by Dana J. Willis and Paul F. Taglione, appellants herein. Willis and Taglione strive to convince us that the district court's release order far outstripped the bounds of its authority and/or discretion. We believe it did not and, therefore, affirm.

* Of the Federal Circuit, sitting by designation.

## I. PROCEEDINGS BELOW

On February 11, 1987, the FTC filed a complaint against Willis, Taglione, and their closely-held corporation, Standard Financial Management Corporation (SFMC). The complaint alleged that through SFMC, which transacted business under the name and style of "New England Rare Coin Galleries", the appellants had engaged in deceptive practices in marketing and selling investment-quality rare coins. These machinations, it was said, were in contravention of the FTC Act, 15 U.S.C. § 45(a)(1), and resulted in losses to consumers in the $15,000,000 range.

The suit was no bolt from the blue. It followed protracted negotiations among the parties. The FTC and the appellants had fashioned a tentative settlement (embodied in a proposed consent decree) which provided, *inter alia*, for injunctive relief and the appointment of special counsel to oversee the liquidation of SFMC. Though the decree suggested consumer restitution, it made relatively modest arrangements to supply the wherewithal for such remediation: payment by an insurer [1] of $1,500,000 into a redress fund, to be augmented by the net liquidation value of the remaining assets of the corporation. The anticipated settlement imposed some rather mild compliance and reporting conditions upon the appellants, but neither envisioned nor required them to contribute personal funds. And, there was every reason to believe that the redress fund would be topped off millions of dollars short of what would be needed to make affected consumers whole.

In agreeing to this settlement, the FTC relied in part upon the sworn personal financial statements submitted to it by Willis and Taglione, respectively. *See, e.g.,* Part IV.P of the Revised Stipulated Final Order and Judgment ("In agreeing to the amount of redress ..., the Commission has relied upon the information shown in [the financial] statements...."). It is these very statements which lie at the core of the current controversy.

The parties jointly presented the consent decree to the district court on the day after the complaint was filed. At the urging of all concerned and because of exigent circumstances, *see supra* n. 1, the district judge reviewed the draft order immediately. He held a lengthy hearing lasting into the early evening of February 12 and provisionally approved the decree on the morning of February 13, subject to several modifications which he instructed the parties to draft. The judge indicated then and there that he was concerned about the accuracy of the principals' financial statements and ordered Willis and Taglione to appear before him on February 24 so that he might, among other things, inquire into the statements. Because of the press of time, it was not thought necessary to await the rewritten version of the decree. The special counsel took control of SFMC, and forthwith filed a Chapter 11 petition for corporate reorganization in the bankruptcy court.

Matters did not come to a standstill pending the resumption of hearings in the district court. To the contrary, the special counsel, under the aegis of the bankruptcy court, began to oversee the tangled affairs of SFMC, and otherwise proceeded to perform under the decree. In the meantime, the financial statements were produced by the appellants in contemplation of the upcoming district court session, and were temporarily sealed. Time and events marched on.

The hearing which was convened on February 24 took place over the course of two days. The district judge questioned the appellants under oath. He ordered the financial statements unsealed and spread upon the court record. Finally, he endorsed and entered the revised consent decree. Willis and Taglione, dismayed by the prospect of revelation of the statements,

---

**1.** The insurer had underwritten certain coverage for SFMC's officers and directors. The sense of urgency attendant to the proceedings in the district court related in large part to the scheduled expiration of this insurance coverage at 12:00 noon on February 13, 1987—an event of considerable potential significance both to SFMC and to those who saw themselves as possible claimants against SFMC, its officers and directors, and/or the redress fund. For present purposes, it suffices merely to note this circumstance; any detailed explanation would be supererogatory.

moved for reconsideration. The district court put the release order temporarily on hold. Thereafter, a local publisher, the Boston Globe Newspaper Company, moved to intervene, seeking access to the documents.[2] Without objection, the court granted the Globe's petition for intervention. The judge then undertook a reexamination of the disclosure order, and decided to stand by it. We stayed release of the financial statements in order effectively to preserve appellants' rights pending consideration in this court.

The appellants sponsor two fundamental contentions. They assert, first, that their financial summaries were not a segment of the court record upon which the judge relied in entering the consent decree, and therefore, the common law presumption of public access never attached to them. Willis and Taglione also asseverate that, even if the documents became court records to which the presumption applied, the statements should remain under wraps because of the idiocratic circumstances which obtain here. We deal at the outset with a jurisdictional question which has arisen, and then treat separately with each of the reasons which the appellants espouse as necessitating continued impoundment of the documents.

## II. APPELLATE JURISDICTION

■ Before turning to the merits, we take a moment to dispel any notion that we are bereft of jurisdiction to entertain the appellants' plaints. To our way of thinking, the release order is a "final"—if collateral—one within the meaning of our jurisprudence. *See, e.g., Boreri v. Fiat S.P.A.,* 763 F.2d 17, 21–26 (1st Cir.1985); *In re Continental Investment Corp.,* 637 F.2d 1, 4 (1st Cir.1980); *United States v. Sorren,*

605 F.2d 1211, 1213 (1st Cir.1979). We briefly summarize our reasoning.

The issue (whether or not the release order is warranted) is easily separable from the ongoing liquidation proceedings. The order is complete in and of itself, and there is no "plain prospect that the trial court may itself alter the challenged ruling...." *United States v. Gurney,* 558 F.2d 1202, 1207 (5th Cir.1977) (quoting C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction,* § 3911 at 470 (1976)), *cert. denied,* 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). So, unsealing is "finished"—rather than "unfinished"—business. Immediate review will enhance, rather than disrupt, whatever proceedings may be necessary below. The privacy right to which the appellants lay claim must be vindicated now, or it will be forever lost; as we lately remarked in an analogous context, to refuse to hear the appeal "would be to force [a party] to let the cat out of the bag, without any effective way of recapturing it if the district court's directive was ultimately found to be erroneous." *Irons v. FBI,* 811 F.2d 681, 683 (1st Cir.1987). Lastly, Willis and Taglione pose a somewhat novel question—a question which possesses some overarching significance and controls the point at issue.

We find that the essential ingredients— "separability, finality, urgency, and importance," *Continental Investment Corp.,* 637 F.2d at 5—are present in sufficient measure to render the appeal eligible for review under the collateral order rule. *See generally Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 169–72, 94 S.Ct. 2140, 2148–50, 40 L.Ed.2d 732 (1974); *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949); *In re San Juan Star Co.,* 662

**2.** The judge, deeming that more than the interests of the parties was involved in the issue raised by the release order, had, *ex parte,* informed an editor that the court had under advisement a motion to impound the financial statements permanently, and invited the Globe to intervene if it chose to do so. The court subsequently made full disclosure of this contact to the parties, none of whom then objected. While we understand the judge's motives and appreciate the sense of urgency under which he

was seeking to resolve matters, we feel compelled to advise against resort to such *ex parte* explorations, particularly with a single entity exclusively selected from a number of possible representatives of the several media. All in all, it would have been far preferable if the court, once it determined the matter to be potentially newsworthy or implicative of freedom of the press, had notified the parties of its conclusion and had alerted the media generally (say, by the issuance and circulation of a notice).

F.2d 108, 112–13 (1st Cir.1981). Accordingly, we advance to the merits of the appellants' objections.

## III. THE PRESUMPTION OF PUBLIC ACCESS

The district court based its release order on the common law presumption that the public ought to have access to judicial records.[3] In *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978), the Supreme Court acknowledged that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Id.* at 597, 98 S.Ct. at 1312 (footnotes omitted). The privilege extends, in the first instance, to "materials on which a court relies in determining the litigants' substantive rights." *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 13 (1st Cir.1986).[4] Those documents which play no role in the adjudication process, however, such as those used only in discovery, lie beyond reach. *Id.* The appellants, predictably, visualize their financial statements as falling at the latter end of the spectrum. They contend that when the judge conditionally approved the consent decree, he effectively terminated that phase of the litigation between them and the FTC. Since he had neither seen nor requested to see the financial statements at that time, this thesis runs, the statements could not have been court records upon which he "relied" in the adjudicatory process.

We find this argument to be unconvincing. In the first place, it takes too restrictive a view of what constitutes a court record for the purpose of allowing public access. In the second place, it distorts the nature and extent of the district court proceedings. Singly, either of these flaws would likely be fatal to the appellants' quest for eternal impoundment. In the ensemble, they serve completely to undermine the foundation upon which these appeals have been constructed.

When a public agency requests that a judicial stamp of approval be placed on a negotiated consent decree, the court has the duty to approve the decree unless it is "unfair, inadequate or unreasonable." *SEC v. Randolph*, 736 F.2d 525, 529 (9th Cir.1984). Though the court should accord some substantial deference to the agency's determination that the settlement is appropriate, *id.*, it must not let judicial inertia take hold. The court, rather than blindly following the agency's lead, must make its own inquiry into the issue of reasonableness before entering judgment. *Cf. Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 96–98, 104 S.Ct. 439, 443–45, 78 L.Ed.2d 195 (1983) (courts should give deference to, but should not rubberstamp, an agency's interpretation of its governing statute). As with review of administrative decisions generally, the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale, given whatever practical considerations may impinge and the full panoply of the attendant circumstances. *Cf., e.g., Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *Mayburg v. Secretary of HHS*, 740 F.2d 100, 105–06 (1st Cir.1984).

■ In making the requisite inquiry, the court may well consider it appropriate—sometimes necessary—to examine some or all of the documents contained in the administrative record. After all, the agency presumably relied upon the totality of this

---

3. The Boston Globe urges that it has independent rights of access, not shared by the appellants, under the first amendment to the federal Constitution. Inasmuch as we find that the common law presumption of public access has attached to these financial statements, *see* text *infra*, we need not reach—and express no opinion upon—the thornier question of the press's access, if any, to court records not otherwise made publicly available.

4. While this presumption has most commonly been applied to records in criminal proceedings, several courts have applied it, as we do here, to civil proceedings. *See, e.g., In the Matter of Continental Illinois Securities Litigation*, 732 F.2d 1302, 1308 (7th Cir.1984); *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178–79 (6th Cir.1983). *See also Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n. 17, 100 S.Ct. 2814, 2829 n. 7, 65 L.Ed.2d 973 (1980).

paperwork in making an informed judgment, and there is no sound reason why the court should be asked to make do with less. Such documents are clearly relevant to a studied determination of whether the consent decree is an equitable, adequate, and reasonable one. Once those submissions come to the attention of the district judge, they can fairly be assumed to play a role in the court's deliberations. To hold otherwise would place us in the position of attempting to divine and dissect the exact thought processes of judges as they ponder the entry of consent decrees—a task more suitable to a clairvoyant than to an appellate court. To avoid the necessity for such mindreading, we rule that relevant documents which are submitted to, and accepted by, a court of competent jurisdiction in the course of adjudicatory proceedings, become documents to which the presumption of public access applies.[5]

■ The financial statements at issue in this case obviously meet this test. The consent decree itself expressly stated that the FTC relied upon them in deciding to enter into the settlement. Thus, they were altogether relevant to the question of reasonableness. *Cf.* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Then, too, the district judge made it plain from the very start that he was particularly concerned about the accuracy of the financial statements because the proposed settlement did not obligate the appellants personally to contribute to reimbursement of hoodwinked consumers.

The reasonableness of this aspect of the settlement could *only* be gauged by scanning the statements and inquiring into them—especially since the consent decree, operating at peak efficiency, likely would not make the victims of the supposed swindle whole.

But, the appellants argue, the adjudicatory process had come to a close by the time that the district court requisitioned and received the financial statements. The district court declared that this premise was inaccurate. We concur. Though the appellants contend that the conditional endorsement of the decree given by the court on February 13 was in fact final and irrevocable (and that the February 24 hearing was scheduled merely to complete the formalities of the procedure), the record belies this claim. The court first expressed interest in the financial statements on the morning of February 13—before *any* order was entered. It noted that it would require Willis and Taglione to attend the February 24 session and "to reaffirm the accuracy of those financial statements" at that time. The approval process remained open and ongoing. It is exquisitely clear that neither the court nor the parties perceived the later hearing to be an empty ritual: there is ample evidence that all of the protagonists understood that the process continued beyond February 13, and that the *court's* initial go-ahead was subject to modification (or even revocation) if the court discerned *at the second round of hearings that the settlement was unreasonable.*[6] The court's concern that there was less to the financial statements than met the eye, *and its fear* that the FTC's reliance on them was overly

---

**5.** In this case, of course, no uncertainty exists. The district judge stated unambiguously (albeit in retrospect) that "the documents now in question were material and important to my decision to approve the settlement." Transcript of *ore tenus* bench decision (April 16, 1987) at 25.

**6.** We cite but two examples. On the day the court gave approval to the modifications of the decree (February 25, 1987), all parties requested that, if the court felt further discussion of the reasonableness of the settlement was needed, they be allowed to address the point further.

So, they were acutely aware that the question remained open.

The judge, too, made it plain that he did not consider the initial (conditional) approval to be final or irrevocable. On February 13, contemporaneous with initial entry of the decree, he expressly reserved the right to review it anew once the required modifications had been effected, and to question Willis and Taglione in person before granting final approval. Such a reservation would have been meaningless if either the court or the parties intended the February 13 approval to close the books on the account.

sanguine, together comprised but one (salient) facet of the reasonableness inquiry.

Nor had the circumstances of the parties changed in so drastic a way between initial approval and final approval some twelve days later. Although the special counsel had initiated a Chapter 11 bankruptcy proceeding during that time on behalf of SFMC, that was not a decision dictated by the consent decree. More important, despite the advent of Chapter 11 proceedings, no appreciable change in the company's financial position had transpired during the dozen day interval. Concededly, many employees had been laid off, locks had been changed, and SFMC had ceased actively to engage in its wonted business. Yet, none of that was necessarily irreversible. There is nothing strange about insolvency proceedings, having once improvidently been begun, being subsequently halted and the parties restored to the *status quo ante.* *See, e.g.,* 11 U.S.C. § 1105 (1984) ("At any time before confirmation of a plan ... the court may terminate the trustee's appointment and restore the debtor to possession and management of the property of the estate, and operation of the debtor's business."). *See also* 5 Collier on Bankruptcy § 1105.01 at 1105–1—1105–2 (15th Ed.1980) (appointment of a trustee should be rescinded if the court determines, based on newly-emergent facts, that the petition was "improvidently granted" or "where conditions have changed" so that continuation is no longer in the interest of the estate or of creditors). Resetting the gears may not have been a simple matter, but it could have been accomplished if needs must.

In sum, we find that the financial statements were germane to the approval process. They were duly submitted to the court in the course of that process. They were relevant and material to the matters *sub judice.* These facts lead inexorably to the conclusion that the district court relied upon the documents in assessing the reasonableness of the order, *i.e.,* in determining the litigants' substantive rights, and in performing its adjudicatory function. The common law presumption of public access therefore attached to them.

## IV. THE EXISTENCE OF SPECIAL CIRCUMSTANCES

The appellants assert that, even if their fiscal profiles are held to be documents to which the public is presumed to have access, circumstances exist which militate against unsealing them. But this, we fear, is wishful thinking.

Public access to judicial records and documents allows the citizenry to "monitor the functioning of our courts, thereby insuring quality, honesty and respect for our legal system." *In the Matter of Continental Illinois Securities Litigation,* 732 F.2d 1302, 1308 (7th Cir.1984). The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch. To be sure, the public's right to inspect such records is not absolute. It can be blunted if "court files might ... become a vehicle for improper purposes," *Nixon v. Warner Communications, Inc.,* 435 U.S. at 598, 98 S.Ct. at 1312, or where access could interfere with the administration of justice. *Newman v. Graddick,* 696 F.2d 796, 803 (11th Cir. 1983). Yet, the presumption is no mere paper tiger. If not "overpowering," *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 434 (5th Cir.1981), the presumption is nonetheless strong and sturdy. The citizens' right to know is not lightly to be deflected. We agree with the Sixth Circuit that "[o]nly the most compelling reasons can justify non-disclosure of judicial records." *In re Knoxville News-Sentinel Co.,* 723 F.2d 470, 476 (6th Cir.1983).

When faced with a claim that cause sufficiently cogent to block access has arisen, it falls to the courts to weigh the presumptively paramount right of the public to know against the competing private interests at stake. *In re Knoxville News-Sentinel Co.,* 723 F.2d at 478. This balance must be struck, of course, "in light of the relevant facts and circumstances of the particular case." *Nixon v. Warner Communications, Inc.,* 435 U.S. at 599, 98 S.Ct.

at 1312–13. The objectors—those seeking to keep the datum hidden from view—must carry the devoir of persuasion. And, when all is said and done, we review the district court's calculation of this equation only for abuse of discretion. *Anderson v. Cryovac, Inc.*, 805 F.2d at 13.

█ The appellants set forth two principal reasons why the financial statements should remain under seal. Initially, they advert to the FTC Act, and specifically 15 U.S.C. § 57b–2, as shielding the documents from prying eyes.[7] Notwithstanding that the very same enactment states that the statutory language upon which Willis and Taglione rely "shall not be construed to prohibit the disclosure of relevant and material information in ... judicial proceedings to which the Commission is a party," 15 U.S.C. § 57b–2(d)(1)(C), the appellants insist that the legislative history of the section indicates a strong congressional policy against disclosure, and that courts should honor that policy.

We have little difficulty in rejecting this hypothesis out of hand, without any detailed analysis of the legislative history of the FTC Act. We have recently cautioned, in emphatic terms, about the dangers of the judiciary "giving sway to [its] conception of the legislative intent rather than to the words which Congress chose to employ." *United States v. Charles George Trucking Co.*, 823 F.2d 685, 688 (1st Cir. 1987). What we said in *Charles George Trucking* has equal pertinency to the matter at bar:

> In determining the scope of the statute, we look first to its language. Where, as here, that language points unerringly in a single direction, and produces an entirely plausible result, it is unnecessary— and improper—to look for other signposts or to browse in the congressional archives.... So long as the statutory language is reasonably definite, that language must ordinarily be regarded as

conclusive (at least in the absence of an unmistakable legislative intent to the contrary).

*Id.* at 688–89 (citations and quotations omitted). *See also Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.*, 545 F.2d 754, 757 (1st Cir. 1976) (to like effect), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

Here, the phraseology of the FTC Act brooks no doubt. It plainly exempts judicial proceedings like this one—in "which the Commission is a party," 15 U.S.C. § 57b–2(d)(1)(C)—from the confidentiality requirements of the statute. The only precondition is that the information be "relevant and material." *Id.* That condition has been fulfilled in ample measure. *See supra* Part III. And, whatever implications they may argue to the contrary, even the appellants have been unable to point to a shred of convincing evidence of an "unmistakable legislative intent" countermanding documentary disclosure when the course of judicial proceedings reasonably so requires. Thus, under the Act, we come full circle: the matter of disclosure *vel non* reposes in the sound discretion of the district court, which "must apply the rules and principles governing the right of access to court documents as in any other civil case." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1180 (6th Cir.1983). *Cf.* 16 C.F.R. § 4.10(g) (material obtained by the FTC, not otherwise public, may be disclosed in judicial proceedings subject to "appropriate" protective orders).

█ The appellants' second strike falls equally wide of the mark. They urge that release of the documents will intrude impermissibly upon their privacy (and that of their families). We recognize that " 'privacy rights of participants and third parties' are among those interests which, in appropriate cases, can limit the presumptive right of access to judicial records." *In re Knoxville News–Sentinel Co.*, 723 F.2d at 478 (quoting *Brown & Williamson*, 710

---

**7.** 15 U.S.C. § 57b–2, insofar as it is relied upon by the appellants, provides in pertinent part that, while in the possession of the FTC, no "documentary material" secured in the course of an official investigation "shall be available for examination by any individual other than a duly authorized officer or employee of the Commission without the consent of the person who produced the material...." 15 U.S.C. § 57b–2(b)(3)(C). There are, of course, numerous exceptions. *See, e.g.,* 15 U.S.C. § 57b–2(d)(1)(C), discussed *infra*.

F.2d at 1179). Yet, the district court found that doctrine untriggered; in its judgment, the appellants demonstrated no sufficiently compelling reasons to warrant cloaking the documents in secrecy. That finding is, we think, eminently supportable.

We begin by noting that the appellants themselves chose to submit the documents to the FTC as part of the settlement process—a process they could have foregone. The documents apparently worked to the appellants' advantage in reaching a desirable settlement agreement. Willis and Taglione, having reaped the intended benefit of that submission, cannot now plausibly argue that some general notion of fairness requires the settlement to be made public but the documents to be locked away. At the least, it seems logical that privacy rights could not reattach absent a demonstration that the appellants will likely suffer specific, severe harm as a result of disclosure.

When the focus turns in that direction, the record fully supports the district court's finding that no such showing has been made. Despite the perfervid rhetoric, the broad generalization that disclosure will be detrimental to them in other litigation to which they are parties,[8] and the lamentation that public airing of their personal financial affairs is generally unfair to them and their families, Willis and Taglione filed no affidavits and offered no meaningful details. They were wholly unable to point the court below to a single particularized harm which might befall them, or to any sufficiently unique reason to warrant special treatment. They have been similarly unable to limn any such particulars for our edification.

We decline to accept conclusory assertions as a surrogate for hard facts. In the absence of some compendium of chapter and verse—a demonstration that cogniza-

ble harm is lurking in the background—the appellants' orotund protests avail them naught. We continue to believe that "[a] finding of good cause [to impound documents] must be based on a particular factual demonstration of potential harm, not on conclusory statements." *Anderson v. Cryovac, Inc.*, 805 F.2d at 7.[9] *Accord Joy v. North*, 692 F.2d 880, 894 (2d Cir.1982) ("a naked conclusory statement [of feared injury] falls woefully short of the kind of showing which raises even an arguable issue" as to impoundment), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

In fine, Willis and Taglione have failed to demonstrate that exceptional circumstances exist which overbear the public's right of access and render continuing impoundment of the financial statements appropriate. This is especially true when the appellants' need for confidentiality—exiguous on this record—is balanced against the public's substantial stake and interest in the proceedings at bar. It cannot be ignored that this litigation involves a government agency and an alleged series of deceptive trade practices culminating (it is said) in widespread consumer losses. These are patently matters of significant public concern. The threshold showing required for impoundment of the materials is correspondingly elevated. *See In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation*, 101 F.R.D. 34, 38 (C.D.Cal.1984). In our view, the district court acted well within the encincture of its discretion when it released the financial statements from the rigors of the sealing order.

## V. CONCLUSION

The presumption that the public has a right to see and copy judicial records attaches to those documents which properly

---

**8.** The "other litigation" argument rings peculiarly hollow. Willis and Taglione say they are "currently the subject of other private lawsuits." Appellants' Brief at 30. They fear that their financial data will fall into the hands of their litigation adversaries. But, they explain neither how that would harm them in those unidentified suits, nor why—if, as one might expect, the litigation is being prosecuted by customers who believe that they were bilked—the underlying

financial data (or much of it) would not be discoverable in that litigation.

**9.** In *Anderson*, we applied this standard to attempts to limit the first amendment right of access. 805 F.2d at 7–8. We find the criterion equally apposite in the current context vis-a-vis efforts to emasculate the common law right of access.

come before the court in the course of an adjudicatory proceeding and which are relevant to the adjudication. That presumption, so basic to the maintenance of a fair and open judicial system and to fulfilling the public's right to know, cannot be easily overcome. The financial statements at issue in this case are court-related documents to which the presumption of public access has attached. Their disclosure is not prohibited by the FTC Act. And, the appellants have not borne the heavy burden of exhibiting the existence of special circumstances adequate to overcome the presumption of public accessibility. The judge had a right to assess the economic underpinnings of the settlement in determining whether it was fair, sufficient, and reasonable. And the people have a right to know the contents of the materials upon which the agency, and ultimately the court, relied in this endeavor. Here, as in so many other instances, justice is better served by sunshine than by darkness.

The district court did not err in entering the release order or in its subsequent denial of the appellants' motions to reconsider. The stay previously issued must be, and hereby is, vacated. The financial statements shall become part of the district court file, accessible to the public and to the intervenor.

*Affirmed. Stay vacated.*