**LOS ANGELES TIMES, et al., Plaintiffs,**

v.

**COUNTY OF LOS ANGELES, Defendant.**

**No. CV 95–6972 RAP JGX.**

United States District Court,
C.D. California.

Nov. 12, 1996.

Rex Heinke, Timothy Alger, Gibson, Dunn & Crutcher, Los Angeles, CA, Karlene Goller, Los Angeles Times, Los Angeles, CA, for Plaintiffs.

Leela Kapur, Los Angeles County Counsel, Los Angeles, CA, for Defendant.

PAEZ, District Judge.

Pending before the Court are cross-motions for summary judgment. For the reasons set forth below the defendant's motion for summary adjudication of the fourth claim for relief for the alleged deprivation of plaintiffs' First Amendment rights is granted. With the disposition of the First Amendment claim, the Court declines to assert supplemental jurisdiction over the remaining state law claims and orders them dismissed without prejudice.

## I

## Introduction

For some time now, the Los Angeles Superior Court and the Los Angeles County Municipal Courts have maintained automated civil case management systems. Although these courts still maintain paper or "hard copy" case files and records, these automated systems allow the courts to track the progress of a case, and record critical case information such as the case name and number, case events initiated by the parties, or action taken by a court clerk or judicial officer. Not surprisingly, the Superior and Municipal Courts have accumulated a significant amount of information that is helpful to the courts in managing their civil cases. This information is also of interest to credit rating firms, rental agencies, title companies, or information providers. The interest is even greater when it is accessible in an electronic format on a daily basis.

This case involves the Information Access Provider ("IAP") Program, a program recently implemented by Los Angeles County whereby data compiled from the Superior and Municipal Courts automated case management systems is available—through daily electronic transmission—to private parties for a fee pursuant to a subscription agreement with the County. The IAP Program data contains such information as case name and number, attorneys' names, hearing dates, and case disposition (judgment or dismissal). The IAP Program data is available in two parts, a ten year historical compilation and periodic updates of the same information. The ten year compilation on computer tapes is available, at cost, to the general public. However, only IAP subscribers who pay the required fees may obtain daily updates.

In addition to the payment of fees, the IAP Program subscription agreement imposes certain obligations on the subscriber. The subscriber must agree to: 1) indemnify the County from any liability arising from or related to the use of IAP data; 2) maintain liability insurance with the County as an additional insured; 3) not sell the IAP Program data in bulk; and 4) maintain records for the County's review.

In this § 1983 action, the plaintiffs contend that the IAP Program data compilation is a court record to which they have a First Amendment right of access. Accordingly, they contend that limitation of access to the IAP Program data daily update service to paying subscribers with the attendant restriction violates this right.

The First Amendment claim is premised on the assertion that the daily IAP Program data compilation—in its electronic format—is a "court record." The parties dispute whether the automated daily data compilation is a "court record" under California law. Although the IAP Program data compilation may not be a classic hard file court record, it is derived from Superior and Municipal Court case files and then converted into a new automated format. Given the source of the IAP Program data compilation, the Court assumes that it is a "court record." However, for reasons explained below, the IAP data compilation is not the type of court record to which plaintiffs have a First Amendment right of access.

The plaintiffs also allege that the IAP Program violates the following state laws: (1) California Government Code § 25332, because the amount of the IAP Program fees exceeds the County's direct costs; 2) California Government Code § 68150, because the IAP Program limits reasonable public access to court records in their electronic format; and 3) Article 13A, § 4 of the California Constitution, because the IAP Program fee constitutes a "special tax" that must be approved by two-thirds of county voters.

The plaintiffs urge the Court to avoid deciding the First Amendment right of access claim by first addressing the state statutory claims. Indeed, plaintiffs remind the Court that where possible, it should avoid deciding Constitutional claims unnecessarily. The Court is mindful of this settled principle. Yet the Court must also respect principles of comity and federalism. These state law claims are novel, raise issues of first impression, and may directly impact the development, maintenance and use of automated case management systems by the state courts. Further, several of the state law

claims directly challenge the County's ability to maximize its use of County resources that may be financially beneficial to the County and the Superior and Municipal Courts. In light of these concerns and the Court's decision to grant summary judgment on the First Amendment right of access claim, the Court declines to assert supplemental jurisdiction over the state law claims.

## II

### Relevant Facts

The parties stipulated to the following material facts in support of their cross-motions for summary judgment. For the convenience of the Court and the parties, the joint factual stipulation is set forth in full:

1. The Los Angeles County Municipal and Superior Courts are located in more than 40 courthouses throughout the County. A case file is maintained for each civil case. These case files are maintained in paper form and contain, among other items, documents filed by the litigants, court orders, and court generated documents such as notices.

2. To obtain information directly from a case file, a member of the public must visit the courthouse at which the file is maintained. Upon request, members of the public are provided access to these civil case files. An individual may request a copy of any document within the file and court staff will provide one at a set fee which is based upon the costs of duplicating the documents.

3. The Los Angeles County Municipal Court is comprised of 24 independent judicial districts. The Municipal Court districts currently use the following five separate computer systems known as automated case management systems ("ACMS")

  a. LACAS—The automated case management system for civil cases, other than small claims matters, filed in the Los Angeles Municipal Judicial District.

  b. LACAS Lite—The automated case management system for small claims cases filed in the Los Angeles Municipal Judicial District.

  c. CIVAS—The automated case management system for civil cases, other than

small claims matters, filed in any of the 23 municipal court districts other than the Los Angeles Judicial District.

  d. SCOT—The automated case management system for small claims cases filed in any of the 23 municipal court districts other than the Los Angeles Judicial District.

  e. ICMS—A pilot integrated automated case management system which is currently being implemented in the Glendale and Malibu Municipal Judicial Districts and in the Glendale and Burbank Superior Court branches. The Glendale and Malibu Municipal Court Districts have retained usage of the CIVAS and SCOT systems for management of cases that were pending prior to the time of ICMS' implementation.

4. The ACMS systems contain selected elements of information copied from documents contained within the courts' civil case files. The information contained on the ACMS systems is that information necessary to facilitate the execution of the internal clerical processing requirements of the clerks of the courts and their staff. The information contained on the ACMS systems does not constitute a comprehensive compilation of all information contained in the case files. While the information contained on the five above described ACMS systems may differ between systems, in general terms, they all contain information such as the parties' names, the attorneys' names, the case number, the filing date, the judgment amount, the judgment decision, and information relating to the progress of the case such as hearing dates.

5. When documents are filed, hearings held, or orders issued in a civil action in municipal court, court staff updates the appropriate ACMS system with the relevant information. The ACMS systems are used by municipal court staff to facilitate the court staff's clerical processing responsibilities, such as generating notices, establishing court calendars, and generating statistical reports. Through the ACMS systems, municipal court staff may determine the status of any civil case on that particular system, including any upcoming hearing.

6. Through the municipal court ACMS systems, municipal court staff produce a reg-

ister of action for each municipal civil case. If a member of the public requests access to the register of action for a particular municipal court case, court staff generates and prints one from the computer and provides it to him at cost. A register of actions is a document which sets forth a chronological summary of significant events that have occurred in the case through its duration. In civil matters, the terms "register of actions" and "docket" are often used interchangeably but they refer to one and the same document.

7. There is no such document as a case index, as to a given case, contained in a municipal court civil case file or on the ACMS systems.

8. All of the information contained in the ACMS systems regarding a particular case can be found in the paper case file. However, all of the information is not located in one single document in that file.

9. The LACAS System is accessible to the public, at no cost, via two computer terminals located in the civil clerk's office of the Municipal Court, Los Angeles District Attorney service room of the courthouse at 110 North Grand Avenue, Los Angeles. The LACAS Lite System is accessible to the public, at no cost, via a single computer terminal located in the Small Claims Division of the Municipal Court, Los Angeles District. These public access terminals allow members of the public to view the information on-screen. The terminals do not allow members of the public to electronically copy the information such as by downloading the information onto a computer disk or transferring the information on-line to another computer system.

10. There currently exists no public access terminal or other public access to the other three municipal court ACMS systems.

11. The information contained in the five municipal court ACMS systems is currently accessible to the public via:

a. The review of the paper case files;

b. The provision, at cost of duplication, of copies of any document within the paper case files;

c. The provision, at cost, of a hard copy print out of the register of action for a case;

d. The purchase, at cost, of electronic and magnetic computer tapes. These tapes are generated upon request and are tailored based on the parameters given by the requestor. For example, an individual may request select data elements compiled from a date certain. Costs of these computer tapes are based upon the computer time, the programming time and the materials necessary to produce the tapes. Requests for tapes will not be filled on a daily basis and the time required to fill a request for tapes will vary depending upon available resources.

12. The Los Angeles County Superior Court, while one entity, is comprised of 12 branches. The Superior Court has a county wide computerized case indexing system ("SCIS") which contains only basic case information; namely, the case number, case name, case type and date of filing. This system does not contain information regarding hearing dates or judgments. The Superior Court does not currently have a County wide automated case management system. If successful, the ICMS system is intended to replace the SCIS system.

13. Unlike the municipal court ACMS systems described above, due to the SCIS's limited information and function, SCIS is not updated with information as the case progresses. Rather, the basic information about a case which is contained on the system is inputted at or near the time of the case's filing and does not change from that point forward, except when the initial information inputted is modified (e.g. through an amended complaint or substitution of named defendants for Doe defendants).

14. For Superior Court civil cases, hard copies of the register of actions are maintained and open to the public for review and copying at each branch location. There is no such document as a case index contained in a Superior Court civil case file or on the SCIS system.

15. Public access to the SCIS system is available, at no cost, through two computer terminals located at the downtown central civil court house. These public access terminals allow members of the public to view the information on-screen. The terminals do not allow members of the public to electronically copy the information such as by downloading the information onto a computer disk or transferring the information on-line to another computer system.

16. On October 5, 1995, the Los Angeles County Board of Supervisors ("Board") adopted a resolution at the recommendation of the County's Information Systems Advisory Body ("ISAB") that established the courts' Information Access Provider ("IAP") Program. True and correct copies of the resolution, ISAB's executive summary and letter to the Board requesting approval of the IAP Program, and a copy of the Board's minutes reflecting the Board's actions on ISAB's request are attached [to the Joint Stipulation] as Exhibit 1. To participate in the IAP program, an individual or entity must execute a contract with the County. A true and correct copy of the standardized form contract is attached [to the Joint Stipulation] as Exhibit 2.

17. The IAP Program involves the electronic compilation and transmission of selected elements of information copied from the five municipal court ACMS systems and the Superior Court's SCIS system; namely, information which was identified to the County by commercial information providers as being necessary to effectively conduct their commercial enterprises.

18. Specifically, data provided under the IAP Program includes elements of information regarding the individual cases, such as the case name, parties' names, attorneys' names, hearing dates, [and] judgment amount. The IAP Program does not involve the transmission of electronic images of any documents, such as the registers of action, forms or reports. The specific data provided under the Program is detailed on Exhibit A of the standardized IAP Program Contract and shall hereafter be referred to as "IAP Program [d]ata."

19. The IAP Program data is provided to the IAP Program participants through two mechanisms, an historical compilation and the daily update service. Through the historical compilation component, the IAP Program offers the participants the ability to purchase computer tapes which contain an historical compilation of the IAP Program data dating back approximately ten years.

20. The County's cost of producing this compilation is $21,683.00. The compilation will be provided to the Program participants at the participants' pro rata share of that cost. Specifically, upon enrolling in the Program, each participant will deposit $5,000 with the County. After one year, the County will determine the exact amount of each participant's pro rata share depending upon the actual number of participants. Each participant will then either receive a refund in the form of a credit toward future access fees to the daily update service or, if the pro rata share exceeds the $5,000 deposit, will be required to make an additional payment toward the cost of producing the compilation.

21. Any member of the public wishing to purchase the historical compilation but not participate in the IAP Program's daily update service may do so without enrolling in the Program. Specifically, they can do so by making a request for the compilation and paying the cost of producing the compilation. There is no necessity or requirement that they execute an IAP Program contract.

22. As changes are made to the information contained on the ACMS systems and information regarding new cases is added to either the municipal court ACMS systems or the SCIS system, this new data will be compiled and transmitted to a County mini-computer on a daily basis. Through the daily update service, IAP Program participants may, at their convenience, electronically retrieve, via modem, this new data, at any time during the 30 days that it resides on the mini-computer. When retrieved by the Program participant, the data is in what is known as a flat file. A print out of a portion of the data in this form is attached as Exhibit 3 to the Joint Stipulation.

23. As the data provided under the IAP program contains only selected elements and

exists in the "flat file format," it is unreadable and therefore unusable by the courts or the general public in that condition. Upon enrolling in the IAP Program, a Program participant will receive a list of data specifications which sets forth the general parameters of the data provided through the Program. This list is approximately twenty pages in length and is provided through hard copy paper form. This list of data specifications will be utilized by the IAP Program participants to reformat the data so as to make it readable and useable.

24. The County does not intend and does not have the technical resources to provide that reformatting.

25. Court staff will not be given access to the mini-computer and the IAP Program data will not be made available to or accessible by the court staff for their daily activities or operations, as it is of no use or value to them. The municipal court ACMS systems and the data contained therein is used by the municipal court staff for their daily activities. However, the IAP Program data will not be, and is not now, used in the operations of the courts, either on a day-to-day or on a less frequent basis.

26. Any person wishing to receive hard copy print outs, in flat file form, of the data retrievable by the Program participants through the daily update service, may do so, as often as on a daily basis. An individual wishing to receive these hard copy print outs will be charged the cost of printing them off the computer. In addition, any person wishing to receive the list of data specifications may do so, at the cost of duplication. This list will be provided to the individual in the same hard copy paper form as it is provided to the IAP Program participants.

27. Due to the limited space available on the County's mini-computer, the data copied from the source systems only resides on the mini-computer for approximately 30 days. After that time, there is no way for the County to retrieve that specific data.

28. As consideration for participating in the daily update service component of the IAP Program, each IAP participant is required to pay access fees. These fees are determined by the participant's selection of one of the following two methods:

a. Twenty-five percent of each transaction fee charged by the IAP participant to its customer, or $1.25 for each transaction, which ever is greater (a transaction occurs each time an on-line inquiry is made against data provided to the IAP participant through the IAP Program); or

b. Forty cents for each newly filed municipal court case and twenty cents for each newly filed superior court case regarding which data is transferred to the participant via the Program. Participants pay this fee only for data received on a newly filed case and not for data received with respect to previously filed cases. The superior court case fee will rise to forty cents when the superior court data becomes comparable, in scope, to the municipal court data.

29. The fee for the daily update service was based on the County's determination of the value of that service to the Program participants. Specifically, the County surveyed private, commercial companies which provide searches of data and determined, on average, how much they pay for data comparable to the data being provided under the IAP Program. In addition, the County surveyed the commercial market to determine the standard percentage negotiated between the provider and marketer of data comparable to the data being provided under the IAP Program. Thus, the County anticipates that the fees charged for the daily update service will generate revenue for the County that will exceed the cost of providing the service.

30. The fees for the daily update service was researched under the auspices of ISAB. ISAB is a subcommittee of the Countywide Criminal Justice Coordination Committee ("CCJCC"). Attached hereto [to the Joint Stipulation] is a list of the full membership of both ISAB and CCJCC. At a regularly convened, public ISAB meeting, ISAB staff presented the IAP Program, including the access fee for the daily update service, to the ISAB membership. Following that presentation, a motion was made to approve the IAP program, including the access fee for the daily update service, and to submit the IAP

Program to the Board of Supervisors for approval. That motion was unanimously approved.

31. Prior to its presentation to the Board of Supervisors, the CCJCC was briefed on all aspects of the IAP Program, including the access fee for the daily update service. The Board, based upon a request of ISAB, approved the IAP Program, including the fees associated with that Program.

32. Neither the superior court nor the municipal courts ever issued a court order or a local court rule adopting the fees associated with the IAP Program.

33. The access fees for the daily update service was not presented to the County's general electorate for approval.

34. In addition to the fees set forth above, each participant must deposit with the County $5,000 as a security deposit against the participant's failure to pay its daily update service access fees. After twelve months, if the participant has paid its access fees, the County shall reimburse the $5,000 deposit via a credit against future access fees.

35. The County estimates that the IAP Program has the potential to generate between $1.2 million and $1.8 million per year. Ten percent of the revenue generated will be withheld by ISAB for the general administration of the IAP Program. Seventy two percent of the revenue will be distributed to the courts for reinvestment in technology. This will include the purchase of hardware, software and programming services to maintain the automated systems currently used by courts, to work towards the development of any integrated automated management system, and to enhance public access to court records. Eighteen percent of the revenue will be deposited into the County General Fund.

36. The standard IAP Program contract approved by the Board of Supervisors contains, among others, the following provisions:

a. Participants shall indemnify the County from any liability and expense arising from or related to use of the data provided by the County.

b. Participants shall maintain liability insurance that names the County as an additional insured, including automobile and workers' compensation insurance.

c. Participants accept all data AS IS and acknowledge that the data provided by the county may be subject to error or omission and therefore agree that County shall not be responsible nor liable in any way whatsoever for the validity of any data provided.

d. Participants shall ensure that a statement is displayed or provided to each of its customers at the time of each Transaction which states, in effect, that the County and the courts do not warrant that the information is accurate or correct and deny liability for any damages resulting from the release of the data.

e. Participants shall include, with the transmission of court data to their clients, a warning that, in order to assure the accuracy of the supplied information or data, the client should personally consult the "official" record.

f. Participants are prohibited from selling data obtained through the IAP Program in bulk, via multiple record, or on CD–ROM or other electronic or optical media.

g. Participants are required to keep and make available to the County for review, records of all recipients of information obtained from the Program. Participants who choose to pay the County fees based upon the number of court filings rather than based on the number of customer transactions are not exempt from this requirement.

h. Participants shall fully comply with Los Angeles County's lobbying ordinance, County Code Chapter 2.160. A copy of County Code Chapter 2.160 is attached hereto as Exhibit 4.

37. The methods of access to court information set forth in paragraph 11 above, have not and will not be impacted by the IAP Program. As such, persons not electing to participate in the Program can continue to access the court information through those methods.

38. Members of the public who review or duplicate civil court records that are maintained in hard copy paper form or provided in hard copy paper form are not required to enter into a contract with the County or agree to any of the terms set forth in paragraph 36(a)-(h).

39. There is no information contained in the IAP Program data that is not contained in the paper case file.

## III

### Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In a trilogy of 1986 cases, the Supreme Court clarified the standard for summary judgment. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Whether a fact is material is determined by looking to the governing substantive law; if the fact may affect the outcome it is material. *Id.* at 248, 106 S.Ct. at 2514. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *see also* Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial §§ 14:123–141 (1993). Here the

parties have stipulated to the material facts, so resolution of plaintiffs' First Amendment claim by summary judgment is appropriate. The First Amendment issue, in this context, is a question of law.

## IV

### Analysis

A. *Resolution of the First Amendment Right of Access Claim*

Plaintiffs cite to the general principal that courts should avoid deciding a case on federal constitutional grounds when it can be decided on alternative state law grounds. *See* Opposition at 26 (citing *Vernon v. Los Angeles,* 27 F.3d 1385, 1391–92 (9th Cir.1994)). Based on this principle, plaintiffs urge the Court to avoid deciding defendant's Motion for Summary Adjudication of plaintiffs' First Amendment right of access claim. Instead, plaintiffs request the Court first to decide the state law issues raised by the other claims in the Second Amended Complaint ("SAC").

However, the presumption against unnecessarily resolving federal constitutional claims is not an overriding concern in First Amendment cases. In *Ripplinger v. Collins,* 868 F.2d 1043, 1048 (9th Cir.1989), the Ninth Circuit held that a district court acted properly in declining to exercise Pullman abstention in an action which involved First Amendment issues.[1] "[T]he guarantee of free expression is always an area of particular federal concern. Moreover, abstention would force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings and effect the impermissible chilling of the very constitutional right he seeks to protect." *Id.* at 1048 (internal brackets, citations, and quotations omitted).

Ironically, in this case, it is the plaintiffs who are seeking a delay in the adjudication of their First Amendment right of access

1. Federal courts should consider abstaining in cases involving both federal constitutional claims and state law issues of first impression, where deciding the latter might make resolution of the federal constitutional questions unnecessary. A court's exercise of this discretion, known as *Pullman* abstention, prevents unnecessary adjudication of federal constitutional issues. *See Railroad Commission v. Pullman,* 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971 (1941).

claim. The Court declines plaintiffs' invitation.

### B. *The First Amendment Right of Access*

■ Before 1980, federal courts did not recognize a First Amendment right of access to judicial proceedings and court records. In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the U.S. Supreme Court broke new ground by recognizing that the First Amendment gave the press and public an affirmative qualified right of access to criminal court proceedings. *See*, Eugene Cerruti, *"Dancing in the Courthouse": The First Amendment Right of Access Opens a New Round*, 29 U. RICH. L. REV. 237 (1995).

In *Richmond*, the Court reviewed a state trial court's closure of a criminal trial to the public and press "without any demonstration that closure [was] required to protect the defendant's superior right to a fair trial, or that some other overriding consideration require[d] closure." 448 U.S. at 564, 100 S.Ct. at 2821 (plurality opinion by Chief Justice Burger). The Court, lacking a solid majority, issued a plurality opinion with five concurring opinions and one dissenting opinion. A majority of the Court concurred that the trial court violated the public's right of access under the First Amendment. *Id.* at 580, 100 S.Ct. at 2829.

Chief Justice Burger and Justice Brennan offered two different rationales for the holding in *Richmond*. *See generally*, Cerruti, *supra*, at 271–83. Chief Justice Burger emphasized the long history in Anglo American law of *public* criminal trials. *Richmond*, 448 U.S. at 566–69, 100 S.Ct. at 2821–23. Public access to criminal trials ensured fair proceedings, were of therapeutic value to the community, and served to educate the public about the rule of law and the criminal justice system. *Id.* at 569–73, 100 S.Ct. at 2821–26.

Justice Brennan emphasized the "structural role [the First Amendment played] in securing and fostering our republican system of self-government." *Id.* at 587, 100 S.Ct. at 2833. The First Amendment aided the cause of democracy by allowing the citizenry to view the courts, which fostered an informed public. *Id.* at 587–88, 100 S.Ct. at 2833–34.

Justice Brennan, however, recognized that "the stretch of this protection is theoretically endless." *Id.* at 588, 100 S.Ct. at 2833. To limit this right of access, he referenced two criteria: (1) the historical tradition of public access to a judicial proceeding or source of information; and (2) a specific analysis of the value of access to the particular proceeding or source of information. *Id.* at 588–89, 100 S.Ct. at 2834.

Justice Brennan then described the long history of public criminal trials. *Id.* at 589–93, 100 S.Ct. at 2834–36. He also discussed the importance of open criminal trials to American democracy.

> Open trials assure the public that procedural rights are respected, and that justice is afforded equally. Closed trials breed suspicion of prejudice and arbitrariness, which in turn spawns disrespect for law.

*Id.* at 595, 100 S.Ct. at 2837.

In addition, laws are interpreted and given practical application every day in the courts. The public has a general interest in learning how the courts apply the law, and their vigilance serves as a check against the judicial abuse of power. *Id.* at 596, 100 S.Ct. at 2838. Public trials also help the courts achieve more accurate fact finding by ensuring that witnesses testify truthfully and alerting previously unknown witnesses to the proceedings. *Id.* at 596–97, 100 S.Ct. at 2838–39. For all these reasons, Justice Brennan concluded that,

> ... public access is an indispensable element of the trial process itself. Trial access, therefore, assumes structural importance in our "government of laws." (citation omitted).

*Id.* at 597, 100 S.Ct. at 2839.

Since *Richmond*, the Supreme Court has revisited the First Amendment right of access only in the context of criminal proceedings. *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (closure of proceedings during the testimony of under age rape victim was unconstitutional, despite its long historical tradition); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819,

78 L.Ed.2d 629 (1984) (closure of voir dire in criminal cases was unconstitutional, in light of importance of that process to the criminal justice system and the long history of public voir dire); *Press–Enterprise Co. v. Superior Court,* 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) (closure of criminal preliminary hearing in California was unconstitutional since it was sufficiently like a trial to justify the same conclusion.).

Although the Supreme Court provided little guidance to explain the extent to which the First Amendment right of access applies to different types of trial proceedings, lower federal and state courts have actively extended the scope of *Richmond.* Courts have extended the First Amendment right of access to "suppression hearings; bail hearings; sentencing hearings; change of venue hearings; plea hearings; contempt proceedings; pretrial ex parte recusal proceedings; postconviction proceedings; parole revocation hearings; parole release hearings; executions; bench conferences; chambers conferences; juvenile proceedings; courts martial; civil [ ] proceedings; preliminary injunction proceedings, and, to be sure, closure proceedings." Cerruti, *supra,* at 266 (see cited authorities).

Lower courts have also extended the public's First Amendment right of access to a variety of court records, including "indictments; all motion documents; all pretrial documents; post-trial documents; closed criminal case files; trial exhibits; recusal motion documents; plea hearing documents; sealed plea agreements; bail hearing documents; submitted Criminal Justice Administration (CJA) forms; affidavits of already-executed search warrants; jury lists; juror questionnaires; appellate briefs; and all documents in a civil suit." *Id.* (see cited authorities).

The Third and Seventh Circuits have written helpful opinions on the extent to which the First Amendment right of access applies to civil court files and records. *In the Matter of Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir. 1984), the defendant corporation in a shareholder derivative suit appealed the district court's order allowing public access to a "special litigation report" which defendant had submitted in support of its motion to terminate the shareholder derivative action. The defendant claimed that attorney-client privileged communications and work product material in the special litigation report argued against public access. *Id.* at 1302–06.

Even before balancing the interests of the parties, the court held that "[b]ecause the Report was admitted into evidence in connection with a motion pending before the district court and because the court expressly relied on the Report in reaching a tentative disposition of the motion, the public is presumptively entitled to the Report." *Id.* at 1304. The court emphasized that a motion to terminate a shareholder derivative lawsuit has been characterized as a "hybrid summary judgment motion[ ]." *Id.* at 1309.

In *Publicker Industries, Inc. v. Cohen,* 733 F.2d 1059 (3d Cir.1984), several newspaper publishers appealed the district court's order to close hearings and seal transcripts of various motions in a civil proceeding. In reversing the district court, the Third Circuit first found that the same reasons supporting a First Amendment right of access to criminal trials applied with equal force to civil trials. *Id.* at 1067–70. The court then held that the public had a right of access to the civil proceedings in the district court. *See also NBC Subsidiary (KNBC–TV) v. Superior Court,* 49 Cal.App.4th 487, 56 Cal.Rptr.2d 645 (1996) (reversing trial court order barring press from civil trial proceedings).

The above cases involved the right to attend court proceedings; the right to gain access to documents filed in court; and the right to gain access to documents relied upon by a court in its decision-making process. In the present case, plaintiffs seek access to a fundamentally different type of "court record"; a "court record" not relied upon by any court in its decision-making process (e.g.pleadings, exhibits, briefs, transcripts), nor a "court record" setting forth the legal reasoning of a judge (e.g. memorandum orders and transcripts) Rather, plaintiffs seek on-line access to electronically compiled data in its "flat file format,"; data in a format not

relied upon or used by judges or court clerks in deciding or tracking cases.

At best, the IAP Program data constitutes a compilation of information about civil cases. The IAP Program data, in the manner and format sought by plaintiffs, does not meet the various tests announced in *Richmond* and its progeny to qualify as the type of "court record" or "court document" to which the public has a First Amendment right of access—historical tradition and structural usefulness to the American democratic tradition.

By definition, there is no historical tradition of allowing public access to records like the IAP Program data in the format and manner sought by the plaintiffs. The on-line availability of such information is made possible by modern computer technology. Moreover, the data at issue here is not used by judicial officers or court staff in its "flat file format." There certainly can be no historical tradition of allowing public access to "court records" that are not used by or accessible to Superior Court and Municipal Court clerks and judges.

If a First Amendment right of access exists, then the Court must find that on-line daily access to the IAP Program data would promote public confidence in the judiciary; would ensure more accurate factfinding; or would give the public information about how the law is practically applied by Superior and Municipal court judges. In reality, public access to the IAP Program data in the manner sought by plaintiffs would not serve any of these purposes.

Just how on-line access to the IAP Program data in its "flat file format" would enhance the public's confidence in Los Angeles County Superior and Municipal Courts is not at all clear. The data, when converted from its flat file format, is at most a summary description of case specific information. In other words, a member of the public cannot actually access case files, pleadings, documents, court orders or opinions. To be sure, an IAP Program subscriber can determine, with considerable speed, the status of a case, the ultimate disposition of a case, whether a particular individual is a party to a case, and the name of the attorney[s] representing the party. Significantly, however, a subscriber can not ascertain the legal and factual contentions advanced by the parties, the content of documents submitted to the court, or the legal reasoning applied by the court in deciding a pretrial motion or rendering a judgment. Such critical case information can only be obtained by observing a court proceeding, reviewing a court file, or obtaining a transcript of a court proceeding.

Even with daily access to the IAP Program data, all of these methods and court records remain available to plaintiffs and members of the public. Thus, daily on-line access to the IAP Program data does little to enhance public confidence in the courts.

In rejecting the plaintiffs' First Amendment right of access claim, the Court does not mean to suggest that the IAP Program data with its daily on-line accessibility is not a significant technological development. Use of the IAP Program data may well be of interest and convenience to the plaintiffs, academics, or other public officials with an interest in the administration of the civil justice system in Los Angeles County. Plaintiffs, however, have not established a violation of their First Amendment right of access. To succeed on their demand to access the IAP Program data without the constraints of the subscription agreement, plaintiffs must look to state law.

### C. Supplemental Jurisdiction

■ The Court has supplemental jurisdiction over the state law claims in the SAC under 28 U.S.C. § 1367(a), which provides in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

By granting summary adjudication on the First Amendment right of access claim the Court may decline supplemental jurisdiction over the remaining state law claims and dismiss them without prejudice. *See Executive*

*Software v. United States Dist. Court,* 24 F.3d 1545 (9th Cir.1994) (requiring district court to give specific reasons under § 1367 for remand in a case where defendants had originally removed the action from state court to federal court).

Section 1367(c) provides:

The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The Court declines to exercise supplemental jurisdiction over the state law claims pursuant to § 1367(c)(1), since they present novel issues of state law concerning the IAP program: e.g. does the IAP program constitute an "enhanced" or "optional" government service within the purview of California Government Code § 25330–25332; does the IAP Program data compilation constitute a "court record" within the meaning of Government Code §§ 68150–68152; and does the IAP subscription fee constitute an illegal special tax under Article 13A, § 4 of the California Constitution?

The Court also has discretion to decline supplemental jurisdiction over the state law claims under § 1367(c)(3). The First Amendment claim is the only one over which the Court has original jurisdiction. Dismissal of that claim allows the Court to decline jurisdiction over the accompanying state law claims.

By virtue of the dismissal of the only claim for relief that gave the Court original jurisdiction in this case, the second through fifth claims for relief are dismissed without prejudice so that plaintiffs may pursue those claims in state court.

## V

### *Conclusion*

For the reasons set forth above, defendant's Motion for Summary Adjudication on the First Amendment right of access claim is GRANTED. The Court declines to accept supplemental jurisdiction over the remaining state law claims in the Second Amended Complaint and the remaining state law claims are dismissed without prejudice. Judgment shall be entered forthwith.

IT IS SO ORDERED.